**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 SEP 28 PM 4: 42

CLERK

BY_____


STEVEN TENDO,

      Plaintiff,

  -against-

UNITED STATES OF AMERICA; U.S.
DEPARTMENT OF HOMELAND
SECURITY; ALEJANDRO N.
MAYORKAS, in his official capacity as
Secretary of the Department of Homeland
Security; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; and
PATRICK LECHLEITNER, in his official
capacity as Acting Director of U.S.
Immigration and Customs Enforcement,

      Defendants.

2:23-cv-438

---

## COMPLAINT

---

## INTRODUCTION

1.     This case is about the negligent and wrongful acts and omissions of federal

officers, egregious and intentional failures to follow and implement U.S. immigration policies

and regulations, and the resulting harm inflicted on an asylum seeker from Uganda who was

placed in a full-body restraint device called "The WRAP" twice prior to a planned deportation.

2.     Plaintiff brings claims against the United States under the Federal Tort Claims

Act because individual officers of Immigration and Customs Enforcement ("ICE") undertook

severe and retaliatory abuse and neglect of Plaintiff and other Black asylum seekers in immigration detention.

3.    High-level officers at the headquarters of the Department of Homeland Security ("DHS") and ICE have been well-aware of persistent abuses of detained individuals in ICE custody during the period relevant to this complaint yet did nothing to remediate these abuses or enforce existing agency policies and regulations that proscribe the abuses at issue here. The persistent failure of high-level DHS and ICE officials to comply with their own policies and hold individual officers accountable for the abuse that Plaintiff and other Black asylum seekers complained of contributed to a culture of impunity, violence, and racism among individual ICE officers and led to Plaintiff's mistreatment.

4.    The case is also brought against DHS and ICE under the Administrative Procedure Act ("APA"), for their failure to follow agency guidelines, in violation of the *Accardi* doctrine.

5.    Plaintiff is a Ugandan national who came to the United States seeking asylum from persecution by the Ugandan government. Plaintiff was arrested and tortured many times in Uganda for supporting political prisoners and voting rights. During one torture session, two of his fingers were cut off.

6.    After requesting asylum in the U.S., Plaintiff was placed in immigration detention in the custody of DHS and ICE. During his detention, Plaintiff experienced numerous abuses and medical neglect at the hands of U.S. government officers and agencies. In particular, Plaintiff was subjected to medical neglect, forced fingerprinting, solitary confinement, and the improper use of restraints, including a full-body restraint device called The WRAP. This abuse inflicted severe physical and mental harm.

7.     Defendants' treatment of Plaintiff is part of a practice of abuse and discrimination by ICE. Black asylum seekers from Africa and the Caribbean have repeatedly reported experiencing serious impediments to seeking asylum in the U.S. and harms in immigration detention, including racist targeting, physical and verbal abuse, and higher rates of detention, solitary confinement, and denial of asylum claims.[1]

8.     In comparison to others, Black migrants in ICE detention are subjected to higher bond payments, forcing them to remain in disproportionately prolonged periods of ICE custody.[2] FOIA litigation revealed that federal officials hold disturbing and racist attitudes towards Black migrants.[3] Plaintiff, along with four Cameroonian asylum seekers, filed a complaint with DHS's office of Civil Rights and Civil Liberties (CRCL), including about the abuse suffered due to ICE's improper use of The WRAP. They are unaware of any formal actions or changes in ICE's operations in response to those complaints.

9.     In the last decade, there have also been "allegations of egregious physical abuse" on deportation flights, including reports of ICE officers using beatings, taser shocks, "body bag"-like restraint devices, shackles, and denying access to the bathroom during lengthy flights.[4]

---

[1] *See, e.g.*, *Black Immigrant Lives Are Under Attack*, RAICES (Jul. 2020), https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/; *US Discrimination Against Black Migrants, Refugees and Asylum Seekers at the Border and Beyond*, (Aug. 2022), https://humanrightsfirst.org/wp-content/uploads/2022/08/CERD-1pger_US-Discrimination-Against-Black-Migrants-Refugees-and-Asylum-Seekers-at-the-Border-and-Beyond.pdf.

[2] *See Black Immigrant Lives Are Under Attack*, RAICES (July 2020), https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/; US Discrimination Against Black Migrants, Refugees and Asylum Seekers at the Border and Beyond, https://humanrightsfirst.org/wp-content/uploads/2022/08/CERD-1pger_US-Discrimination-Against-Black-Migrants-Refugees-and-Asylum-Seekers-at-the-Border-and-Beyond.pdf.

[3] Center for Constitutional Rights, Briefing Guide: The U.S. Government's Systematic Mistreatment Of Cameroonian And Other Black Migrants (Feb. 6, 2023), https://ccrjustice.org/sites/default/files/attach/2023/02/CCR%20SPLC%20Proj%20South%20Briefing%20Guide%202-6-23.pdf.

[4] *Hidden in Plain Sight: ICE Air and the Machinery of Mass Deportation*, Univ. of Wash. Ctr. for Hum. Rts. (April 23, 2019), https://jsis.washington.edu/humanrights/2019/04/23/ice-air/.

-3-

Inspectors within DHS have also found evidence of abuse, racist treatment, and retaliation after detained individuals submitted grievances and complaints.[5]

10.    FOIA litigation has revealed that federal officials hold disturbing and racist attitudes towards Black migrants and treat mass deportations to African countries as a sport.[6] In one email chain, ICE "Attachés for Removal" used sports terms to refer to missing out on the deportation of African immigrants due to lack of travel documents.[7]

11.    Human Rights Watch has extensively documented allegations of discrimination and torture against Black migrants while in ICE custody.[8] The persistent failure of high-level DHS and ICE officials contribute to a culture of impunity, violence and racism of individual ICE officers and were a cause of Plaintiff's mistreatment here.

12.    Plaintiff brings this action under the FTCA and APA seeking redress for the extraordinary harm he suffered at the hands of DHS and ICE officials.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction in this case, which arises under federal law, pursuant to 28 U.S.C. § 1346(b) because this is a civil action against the United States for personal injury caused by the negligent and wrongful acts and omissions of government employees.

---

[5] Tom Dreisbach, *Government's Own Experts Found 'Barbaric' and 'Negligent' Conditions in ICE Detention*, NPR (Aug. 16, 2023), https://www.npr.org/2023/08/16/1190767610/ice-detention-immigration-government-inspectors-barbaric-negligent-conditions.

[6] Ctr. for Const. Rts., *Briefing Guide: The U.S. Government's Systematic Mistreatment of Cameroonian and Other Black Migrants* (Feb. 6, 2023), https://ccrjustice.org/sites/default/files/attach/2023/02/CCR%20SPLC%20Proj%20South%20Briefing%20Guide%202 02-6-23.pdf.

[7] *Id.*

[8] HUM. RTS. WATCH, "HOW CAN YOU THROW US BACK?" ASYLUM SEEKERS ABUSED IN THE US AND DEPORTED TO HARM IN CAMEROON (Feb. 10, 2022), https://www.hrw.org/report/2022/02/10/how-can-you-throw-us-back/asylum-seekers-abused-us-and-deported-harm-cameroon.

14.     This action is also brought under the Administrative Procedure Act ("APA").
Jurisdiction is proper under the judicial review provisions of the APA, 5 U.S.C. § 702, and
pursuant to 28 U.S.C. § 1331.

15.     This Court can enter declaratory, injunctive, and further necessary or proper relief
to recognize and remedy the underlying violations under 28 U.S.C. §§ 2201 and 2202
(declaratory relief), 5 U.S.C. § 706 (agency action), and the Court's inherent equitable powers.

16.     On July 29, 2022, Plaintiff submitted an administrative claim to DHS, ICE, and
the Department of Health and Human Services ("HHS") pursuant to 28 U.S.C. § 2675(a).

17.     DHS and ICE issued a final denial of Plaintiff's claim on March 29, 2023.
Accordingly, Plaintiff has exhausted all potential administrative remedies under 28 U.S.C. §
2401(b).

18.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(C) and 5 U.S.C. § 703 for
claims arising under the APA, because the plaintiff resides in Vermont.

19.     Venue is also proper under 28 U.S.C. § 1402(a)(1) because the plaintiff resides in
Vermont.

20.     DHS and ICE officials were repeatedly on notice of abusive, retaliatory behavior
by ICE officials in using unlawful force. DHS and ICE officials were ultimately responsible for
promulgating agency guidelines to safeguard against the kind of violations of policies and
regulations that occurred here. DHS and ICE officials directly oversaw conditions at the
detention facilities. The acts and omissions of these officials contributed to the abuses Plaintiff
endured.

## PARTIES

### *Plaintiff*

21.     Plaintiff Steven Tendo ("Mr. Tendo") is a 38-year-old Ugandan man who requested asylum in December 2018 after being repeatedly arrested and tortured by the Ugandan government. Mr. Tendo was incarcerated in immigration detention facilities for over two years under abusive conditions, including being restrained in a device called "The WRAP," and endured severe medical neglect.

### *Defendants*

22.     Defendant United States of America is an appropriate defendant under the FTCA, 28 U.S.C. §§ 1346(b), 2671, *et seq.*

23.     Defendant U.S. Department of Homeland Security ("DHS") is an executive department of the United States Government headquartered in Washington, D.C. DHS is the parent agency of ICE.

24.     Defendant Alejandro Mayorkas is the Secretary of DHS. In this capacity, Mayorkas is ultimately responsible for the actions of ICE. He is the legal custodian of all people detained in immigration detention facilities. Defendant Mayorkas is sued in his official capacity.

25.     Defendant ICE is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants. ICE discharges its responsibility for incarceration of immigrants by promulgating detention standards to be followed in the facilities in which immigrants are held pending removal hearings.

26.     Defendant Patrick Lechleitner is the Acting Director of ICE. In this capacity, Lechleitner is responsible for ICE's policies and practices regarding immigration detention and

oversight of the immigration detention system. Defendant Lechleitner is sued in his official capacity.

## STATEMENT OF FACTS

### I. Background

27.     Mr. Tendo is an asylum seeker who fled persecution and torture in Uganda. He was detained by ICE for over two years between December 2018 and February 2021, primarily at the Port Isabel Service Processing Center ("Port Isabel") in Los Fresnos, Texas. ICE Officers subjected Mr. Tendo to various forms of abuse in detention, including the unlawful use of physical force and restraints and severe medical neglect.

### A. Mr. Tendo's Arrival in the U.S., Detention, and Medical Conditions

28.     Mr. Tendo fled Uganda after numerous arrests and torture. Among other things, Ugandan officials cut off two fingers on his left hand, burnt his legs and feet, and shot him in the leg.

29.     He arrived at the Brownsville, Texas, port of entry and asked for asylum on December 20, 2018. He was detained at Port Isabel Detention Center in Los Fresnos, Texas, received a positive credible fear determination after an interview with an asylum officer, and was placed in removal proceedings.

30.     ICE was aware that Mr. Tendo had diabetes when he was taken into custody. Mr. Tendo had brought with him medications for his diabetes, as well as a finger-prick device that he used to test his blood sugar daily. ICE confiscated the medication and testing device when Mr. Tendo was detained. ICE scheduled his blood sugar to be monitored every three months, instead of daily. Mr. Tendo's medications were changed. He was denied a diet suitable for diabetes. As a

result of ICE's medical neglect, Mr. Tendo's diabetes became uncontrolled, and his blood sugar levels fluctuated dangerously.

31.     Mr. Tendo made numerous requests for a special diet suitable for a diabetic, or at least a Kosher diet, which would have been an improvement, but these requests were ignored or denied. He frequently felt hungry or dizzy. He lost nearly thirty pounds in detention from lack of a proper diet. Mr. Tendo was unable to eat many of the meals given to the detainees because of the high sugar content.

32.     By April 2020, Mr. Tendo had developed a cataract and was going blind in his right eye. Mr. Tendo suffered from numbness and tingling in his extremities. He also had boils all over his body, lesions often caused by infection with MRSA (methicillin resistant Staph Aureus), which spreads rapidly in prison or detention settings. Diabetic patients are at elevated risk of serious life-threatening infections from MRSA.

33.     When an appointment was finally arranged with an eye specialist in early April 2020, it resulted in a recommendation for surgery to remove the cataract caused by Mr. Tendo's uncontrolled diabetes. But the surgery was not promptly scheduled. By the time Mr. Tendo was taken again to the specialist, the surgery could not be scheduled until the lifting of a ban on "elective surgery" owing to the COVID-19 crisis.

34.     Mr. Tendo's attorney had an independent doctor, Dr. Lazlo Madras, MD, review Mr. Tendo's medical records. Dr. Madras's evaluation, dated April 5, 2020, states that metformin is "an insufficient single medication in his case if, while taking it correctly, [Mr. Tendo's] blood glucose [was] over 500." Dr. Madras further noted that "the physicians who treated [Mr. Tendo] in the urgent care center with insulin were providing the correct medication, but not with the right dose or frequency." According to Dr. Madras, the inadequate medical care

that Mr. Tendo had received placed him at "very high" risk of "diabetic retinopathy (development of vision problems), diabetic neuropathy (loss of nerve function and feeling in his feet and hands), and diabetic nephropathy (kidney failure leading to dialysis)." All these conditions could impair Mr. Tendo's ability to function.

35.    As someone with diabetes, Mr. Tendo was highly susceptible to contracting COVID-19 and suffering severe complications from the virus. COVID-19 cases began being reported in Texas in early March 2020, and the numbers grew exponentially. On April 9, 2020, it was reported that a contract employee at Port Isabel had COVID-19. Although ICE required contractors to report COVID-19 cases to the agency, ICE did not include those numbers on its website or in any public reports.

36.    Mr. Tendo saw that newly arriving detainees exhibiting COVID-19 symptoms were placed with the general population within the facility. Detained individuals were not provided with soap or hand sanitizer, had to share toilets with dozens of people, and were unable to isolate in overcrowded dormitories. He saw other detainees who went on hunger strikes to protest the unsanitary conditions being disciplined and placed in "the hole," a solitary room that was kept freezing cold. He did not observe any changes as a result of these protests.

37.    On one occasion, when Mr. Tendo spoke out about the conditions at the facility, he was placed in "the hole"—solitary confinement—for approximately two days. Mr. Tendo was not provided with a blanket and fainted due to his compromised health. He was taken out of the room and only given water.

38.    His experience in "the hole" was so awful that when he subsequently felt COVID-19-like symptoms--loss of appetite and his sense of smell, as well as difficulty breathing—he did not tell anyone for fear of being sent back to "the hole" again.

39.     Despite being well-aware of Mr. Tendo's extreme vulnerability to COVID-19,

ICE denied his requests to be released on parole at least twice. On April 7, 2020, Mr. Tendo

submitted a request to be released to a sponsor in Weslaco, TX, where he could safely self-

isolate, have free access to soap and hygiene products, and eat a diet suitable to his diabetes. His

request was supported by documents that included medical records and an outside doctor's

evaluation of his condition based on a review of his medical records. The request was cursorily

denied by a Deportation Officer almost immediately after it was received. No reasons were

provided for the denial. A request for release that was sent to the ICE Enforcement and Removal

Operations (ERO) San Antonio Field Office was likewise denied on April 15, 2020, with no

explanation.

40.     A declaration by another physician who reviewed Mr. Tendo's medical records,

Dr. Marsha Griffin, MD, dated April 15, 2020, stated that Mr. Tendo's uncontrolled diabetes

placed him "in grave risk for infection of any kind due to a weakening of the immune system."

Dr. Griffin noted that the ophthalmologist's diagnosis of a posterior subcapsular cataract is

"caused by uncontrolled blood glucose levels" and that "the early formation of cataracts (Mr.

Tendo is only 35 years old) can also be sign of an autoimmunity to insulin." She also warned that

if MRSA, which appeared to be causing the boils on Mr. Tendo's skin, entered his blood system,

it could "spread to vital organs, including the heart and brain and could lodge in bones causing

chronic osteomyelitis (bone death)."

41.     By July 2020, Mr. Tendo was in an extremely immunocompromised state and

passed out at the Port Isabel Detention Center. Blood work indicated that he had a neutrophil

count of zero, indicating severe neutropenia, a life-threatening condition. He was also mildly

anemic. A Physician Assistant at Port Isabel requested that he be admitted to the hospital. Mr.

-10-

Tendo was taken to the hospital for one night only. Medication given to Mr. Tendo in detention, such as the antibiotic Bactrim, may have caused or exacerbated the neutropenia.

42.     By late August 2020, ICE's website indicated that over one hundred detainees at Port Isabel had tested positive for COVID-19. Two older men in Mr. Tendo's dormitory contracted COVID-19 and were taken to the hospital. Mr. Tendo never saw them again and was told they had died in the hospital.

43.     Mr. Tendo was eventually scheduled to have his long-awaited cataract surgery on September 3, 2020. However, a week before the scheduled surgery, ICE began the process to deport him, using excessive force.

## B. ICE's Planned Deportation of Mr. Tendo, Unlawful Use of Force, and Unlawful Use of The WRAP Restraint Device

44.     An immigration judge had denied Mr. Tendo's asylum case on June 24, 2019, and the Board of Immigration Appeals (BIA) affirmed the judge's decision on December 12, 2019. Mr. Tendo filed a motion to reopen on December 19, 2019, which was still pending when ICE began the process of trying to deport him.

45.     On August 30, 2020, a group of ICE officers entered Mr. Tendo's dorm at Port Isabel. The officers told Mr. Tendo that he was being transferred. When he refused to follow them because of his pending motion at the BIA and his upcoming surgery, they knocked him down and pushed his face onto the floor. One officer knelt on his neck while another cuffed his hands behind his back. His ankles were also cuffed. Then he was flipped onto his back and wrapped up in what felt like a bag while still shackled. He felt tied up like a chicken that was about to be slaughtered. Based on information and belief, ICE officers did not check to see if Mr. Tendo needed medical care before restraining him.

-11-

46.     The restraint used on Mr. Tendo appears to be a device called The WRAP, which binds the legs together, with the arms cuffed at the back. It is supposed to leave the restrained individual seated, upright, in a 90-degree position so that the lungs and airways are free from compression. Below is a photograph of The WRAP from the website of the manufacturer:



47.     According to The WRAP's manufacturer, the device is a temporary restraint system designed for emergency stabilization only, and no one should ever be left alone in The WRAP.[9] The manufacturer cautions that if anyone being restrained "complains of or exhibits any medical concerns, seek immediate medical attention," and that harnesses "should not be tightened to the point that it may interfere with the subject's ability to breathe."[10]

48.     In Mr. Tendo's case, the strap that connected his torso to his lower legs, just above his ankles, was cinched up to an angle of around 45 degrees, making it very hard for him to breathe, causing extreme anxiety, and inflicting excruciating pain. He was completely immobilized. Any movement only augmented the pain.

49.     Officers dragged Mr. Tendo across the room and out of the dorm to an empty room in the Port Isabel detention facility. There, they lied to him and told him that he was just

---

[9] Safe Restraints, Inc., *The WRAP, Basic Application Manual* 13 (Aug. 2014), [hereinafter 2014 WRAP Manual]. http://www.aflunky.com/uploads/2/3/4/3/23436122/the-wrap-training-manual_8_14.pdf; *see also id.* at 9 ("*Do not overtighten*" the leather strap connecting the chest to the person's legs (emphasis in original).
[10] *Id.*

being transferred to another detention facility. They told him they could not transfer him without his signature and forced him to provide his fingerprints to approve the transfer.

50.     Mr. Tendo was carried into a van while still in The WRAP. ICE officers then loosened the straps to force his legs into a 90-degree position so that he could be seated. However, his arms remained cuffed behind his back, forcing his body to pitch painfully forward. He was left in The WRAP during the entire bus ride to the Laredo International Airport, which took around three and a half hours. He had to use all his strength not to topple over each time the bus turned a corner or bend. His wrists and thumb became numb from the pain. When he asked to use the restroom, ICE officers refused. He was forced to urinate and defecate on himself during the journey.

51.     When the van finally arrived at the airport in Laredo, ICE still did not remove The WRAP or allow Mr. Tendo to clean himself. Instead, they called for more reinforcements to move Mr. Tendo onto the plane in The WRAP. His hands, which had previously been cuffed behind him, were moved and cuffed in front of him for the flight. ICE officers lifted him onto the plane in The WRAP and dumped him on a row of chairs. A seat belt was tied around him. By this time, he had already lost all feeling in his wrists and thumbs and was in excruciating pain. Mr. Tendo was left unattended for most of the flight as the officers were conversing amongst themselves. He remained in The WRAP during the entire flight from Laredo, Texas, to ICE's Alexandria Staging Facility in Alexandria, Louisiana. ICE officers once again refused to let him use the restroom on the flight, so he remained in feces and urine all the way from Port Isabel to Alexandria.

-13-

52.     During his many hours in The WRAP, Mr. Tendo was not only denied access to a restroom, but he was also deprived of food, water, and his medications. Based on information and belief, no one checked on his medical condition during the long journey in The WRAP.

53.     Mr. Tendo saw two other Ugandan men on the plane, and they told him they were being deported. Only then did he realize that he was being transferred for deportation to Uganda.

54.     At the Alexandria Staging Facility, Mr. Tendo was finally released from The WRAP and taken to the bathroom. He was pushed into an open shower to wash the feces and urine off his body. By that time, Mr. Tendo was very hungry, thirsty, shivering, and crying. His body was in excruciating pain.

55.     After showering, he was placed in a small, two-person cell, where the doors are made of glass so that detainees may be observed at all times. Mr. Tendo was once again forced to provide his fingerprints.

56.     Through the glass window of his cell, he witnessed six Kenyans being placed in The WRAP before their deportation from the facility. He believed the ICE officers were sending a message to everyone about what would happen if they resisted in any way.

57.     Mr. Tendo was once again put in The WRAP, on top of five-point shackles, during the flight from the Alexandria Staging Facility to the Phoenix-Mesa Gateway Airport in Arizona, which is "a hub for flights that deport thousands of immigrants every year."[11] As before, The WRAP was applied over shackles. ICE officers boarded him onto the plane in The WRAP and then left him unattended. Mr. Tendo was not allowed to eat, drink, take medication, or use the restroom during the flight from Louisiana to Arizona. Mr. Tendo's wrists and thumbs were in agony from the pressure of the handcuffs and the restraint device. He also

---

[11] Griselda Zetino, *Phoenix-Mesa Gateway Airport is Hub for Thousands of ICE Deportations*, KTAR NEWS (Dec. 16, 2022), https://ktar.com/story/5384697/phoenix-mesa-gateway-airport-is-hub-for-thousands-of-ice-deportations/.

felt severe pain and discomfort from having to remain in one position the entire flight. Based on information and belief, ICE officers never checked on his health while he was in The WRAP.

58.     When the plane landed, Mr. Tendo was carried off the plane, still in The WRAP. The WRAP was finally removed at the ICE staging facility located at or near the Phoenix-Mesa Gateway airport. There, Mr. Tendo witnessed three other Ugandan men being placed in The WRAP. Mr. Tendo saw ICE officers beating one of the Ugandan men before placing him in The WRAP. Mr. Tendo recognized that man and was terrified by what ICE did to him.

59.     Mr. Tendo was transported to the Florence Service Processing Center, where he spent one night, then transferred to the Central Arizona Florence Correctional Center, where he remained for about one week. He was slated to be deported on September 3, 2020, the very day that his cataract surgery had been scheduled. But due to Congressional intervention and public outcry, he was not placed on the planned deportation flight. Instead, he was taken back to the Port Isabel Detention Center in Texas.

## C. Due to Widespread Protest, ICE Did Not Deport Mr. Tendo on September 3, 2020, But ICE Continued to Detain Him for Nearly Six More Months Despite His Severe Medical Conditions

60.     Well before the September 3, 2020, deportation flight, officials at DHS and ICE headquarters were put on notice about the planned deportation of Mr. Tendo. Congressional Representatives, human rights organizations, journalists, lawyers, and advocates all drew attention to the risk of persecution he faced in Uganda and the severe medical neglect that he had suffered in detention.

61.     On or about June 8, 2020, Mr. Tendo's attorney, Jennifer Harbury, filed a complaint with the DHS Office of the Inspector General regarding the inadequate medical care that Mr. Tendo had received at Port Isabel, including failing to provide him with diabetic meals

and failing to separate him from other detainees who were potentially infected with COVID-19, despite his susceptibility to contracting the virus and becoming seriously ill.

62.    Amnesty International spearheaded a global campaign to prevent Mr. Tendo's deportation and urged his release. On June 30, 2020, Amnesty International issued an "Urgent Action" on Mr. Tendo's behalf.[12] Amnesty International drew attention to Mr. Tendo's case again on August 26, 2020[13] and September 2, 2020.[14] The Americas Advocacy Director for Amnesty International USA also sent a letter to Tony Pham, Acting Director of ICE, urging him to halt Mr. Tendo's deportation.[15]

63.    Another human rights organization, Robert F. Kennedy Human Rights, issued a press release on July 30, 2020, calling on DHS to immediately release Mr. Tendo.[16] The press release stressed that Mr. Tendo had "not received the medicine or testing necessary to control his diabetes and is now nearly blind and battling a severely weakened immune system as a result." The press release called it "inhumane and dangerous to keep Pastor Steven jailed at a facility with unsanitary conditions, inadequate healthcare, and an active COVID-19 outbreak."

64.    On August 18, 2020, forty-four members of Congress sent a letter to Chad Wolf, Acting Secretary of DHS, expressing their "grave concern about the on-going and inhumane

---

[12] Amnesty Int'l, Urgent Action, *USA Free Seeker at Risk of Deportation: Steven Tendo* (June 30, 2020), https://www.amnesty.org/en/wp-content/uploads/2021/05/AMR5126272020ENGLISH.pdf.

[13] Amnesty Int'l, Urgent Action, *USA Free Seeker at Risk of Deportation: Steven Tendo* (Aug. 26, 2020), https://www.amnesty.org/en/documents/amr51/2627/2020/en/.

[14] Amnesty Int'l, Advocates Call for ICE Not to Deport a Pastor to Dangerous, Deadly Conditions (Sept. 2, 2020), https://www.amnistia.org/ve/noticias/2020/09/16359/advocates-call-for-ice-not-to-deport-a-pastor-to-dangerous-deadly-conditions.

[15] Letter from Charanya Krishnaswami, Americas Advocacy Dir., Amnesty Int'l, to Tony H. Pham, Acting Dir. Immigr. & Customs Enf't, regarding the Case of Pastor Steven Tendo, Sept. 4, 2020, https://www.amnestyusa.org/wp-content/uploads/2020/09/9.4.2020-Letter-to-Acting-ICE-Director-Pham-re-Pastor-Steven-Tendo.pdf.

[16] Robert F. Kennedy Hum. Rts., Press Release, We Urge ICE to Release Pastor Steven Tendo From Detention (July 30, 2020), https://rfkhumanrights.org/we-urge-ice-to-release-pastor-steven-tendo-from-detention.

treatment of Steven Tendo."[17] In addition to highlighting the threat of persecution that Mr. Tendo

faced in Uganda, the letter called for Mr. Tendo to be "released immediately on medical parole

as he is at high risk of serious illness or even death in ICE detention." The letter noted that Mr.

Tendo had never committed a crime, posed no threat, and that his health had "been ravaged"

because his diabetes was "out of control," he suffered from "recurrent boils," and he was "going

blind." The letter also stressed that Mr. Tendo's "immune system has been nearly destroyed,

leaving him at great risk of imminent infection and even death."

65.     On August 26, 2020, four human rights groups filed a Civil Rights Complaint

with the Office of Civil Rights and Civil Liberties CRCL and the DHS Office of Inspector

General, calling on the agency to investigate violence and discriminatory practices against

African asylum seekers, including the use of force.[18]

66.     News programs also covered Mr. Tendo's case. Democracy Now! ran a headline

on September 3, 2020, stating "Calls Grow for U.S. to Halt Deportation of Ugandan Pastor

Steven Tendo."[19]

67.     There was also public support for his release. A petition circulated on change.org

to "Save Pastor Steven Tendo from Deportation" had over 500 signatures by September 3,

2020.[20]

---

[17] Letter from Congressional Representatives to Chad Wolf, Acting Secretary of DHS regarding Pastor Steven
Tendo (Aug. 18, 2020), https://www.amnestyusa.org/wp-content/uploads/2020/08/Congressional-letter-re-Pastor-
Steven.pdf.

[18] Southern Poverty Law Center et al., *Call for an Immediate Halt to and Investigation of Detention, Violence,
Repression and Racism Against Peacefully Protesting Cameroonian and Black Asylum Seekers, and other Asylum
Seekers, at Pine Prairie ICE Processing Center; and the release of all Black Hunger Strikers from Solitary
Confinement* (Aug. 26, 2020), https://www.splcenter.org/sites/default/files/8.26.20_crcl_letter.pdf.

[19] *Calls Grow for US to Halt Deportation of Ugandan Pastor*, DEMOCRACY NOW! (Sep. 3, 2020),
https://www.democracynow.org/2020/9/3/headlines/calls_grow_for_us_to_halt_deportation_of_ugandan_pastor_ste
ven_tendo.

[20] *Save Pastor Steven Tendo From Deportation*, CHANGE, https://www.change.org/p/u-s-immigration-and-customs-
enforcement-ice-save-pastor-steven-tendo-from-deportation.

68.    ICE did not deport Mr. Tendo on September 3, 2020, due to these widespread protests, and Mr. Tendo was able to have cataract surgery on his right eye. However, ICE still refused to release him. ICE continued to detain Mr. Tendo in life-threatening conditions during the COVID-19 pandemic for nearly six more months. During that time, Mr. Tendo's vision in his left eye deteriorated.

69.    ICE continued Mr. Tendo's detention despite knowledge of ongoing reports of abuses against Black migrants in immigration detention facilities and concerns about "death flights" to African countries such as Cameroon.

70.    For example, on October 13, 2020, Representatives Bennie Thompson and Karen Bass sent a letter urging ICE to stop a scheduled deportation flight to Cameroon and other African countries.[21] The letter cites an October 7, 2020, complaint to ICE, CRCL, and the DHS Office of Inspector General detailing how ICE and contract employees deployed pepper spray, physical restraints, and other use of force measures to obtain the signature or fingerprints of detained asylum seekers on travel documents in violation of ICE's detention standards.

71.    Representatives Ilhan Omar, Cedric Richmond, and Joaquin Castro also sent a letter to ICE on October 13, 2020, raising concerns about both the treatment of Cameroonians in detention and the danger they would face after deportation, and asking ICE to respond to a set of questions about ICE's treatment of Cameroonian migrants.[22]

72.    When ICE proceeded to schedule another deportation flight to Cameroon in November 2020, Senators Chris Van Hollen, Ed Markey, Chris Coons, and Ben Cardin sent a

---

[21] Congressional Black Caucus Letter to ICE (Oct. 13, 2020), https://cbc.house.gov/uploadedfiles/2020-10-13_t_dhs_ice_-_cameroonian_asylum_seekers.pdf.
[22] Congressional Letter to ICE (Oct. 13, 2020), https://omar.house.gov/media/press-releases/reps-omar-richmond-castro-lead-letter-condemn-treatment-cameroonian-migrants.

letter urging ICE to stop that flight.[23] On November 10, 2020, the Congressional Black Caucus also sent a letter to DHS expressing their grave concerns about the November 2020 deportation flight to Cameroon.[24]

73.     Despite the numerous concerns raised about the detention of Mr. Tendo specifically and the treatment of Black asylum seekers in detention more generally, ICE continued to keep Mr. Tendo detained until February 11, 2021.[25] During the final months of his detention, after the outpouring of support and Congressional concern for his case, the medical care that Mr. Tendo received at Port Isabel Detention Center improved somewhat. His glucose levels were monitored daily, and he was given access to a better diet. However, Mr. Tendo remained in pain from nerve damage to his calves and deep bruising on his ankles related to the many hours he had spent restrained in The WRAP.

74.     After his release, Mr. Tendo continued to experience problems with his vision due to the eye damage that occurred during his detention. He was very sensitive to bright and flashing lights and suffered from severe headaches. He underwent surgery to restore vision in his left eye. Due to his vision problems and operation, Mr. Tendo was unable to work for two months after his release. He also required extensive dental work due to the deterioration of his teeth in detention. Additionally, Mr. Tendo required mental health care and physical therapy after his release to cope with the emotional and physical harm he suffered in ICE custody.

---

[23] Senate Letter to DHS (Oct. 28, 2020), https://www. vanhollen.senate.gov/news/press-releases/van-hollen-colleagues-call-on-trump-administration-to-halt-deportation-of-cameroonian-asylum-seekers.
[24] Congressional Black Caucus Letter to DHS (Nov. 10, 2020), https://www.dhs.gov/sites/default/files/2023-05/Jun%20%2801%29_Stop-Deportation-Flight-to-Cameroon.pdf.
[25] Amnesty Int'l, *Urgent Action Victory! Pastor Steven Tendo Released From Detention* (Feb. 11, 2021), https://www.amnestyusa.org/urgent-actions/urgent-action-victory-pastor-steven-tendo-released-from-detention-usa-ua-112-20/.

**D. DHS and ICE Officials Violated Plaintiff's Rights by Disregarding ICE's Policy on the Use of Force and Restraints and the Safe Use Guidelines for The WRAP.**

### i.  The WRAP

75.    The WRAP is manufactured by California-based Safe Restraints, Inc.

76.    ICE authorized use of The WRAP as "the only authorized soft restraint device" in late 2017 and removed the previously used "Humane Restraint Blanket" from the list of restraint devices.[26]

77.    The WRAP is designed to restrain individuals at a ninety-degree upright angle. The individual should be placed "comfortably in an upright and seated position."[27]

78.    The WRAP is designed to be used as a restraint on its own or with handcuffs only, not with five-point restraints.[28]

79.    The application manual for The WRAP clearly states that "[u]pon immediate application of The WRAP, the subject should be assessed for any safety, comfort and/or medical considerations," and notes that chest pains and emotional distress are symptoms for which immediate medical care should be sought.[29]

80.    Sample policies for The WRAP from Safe Restraints stress, "THE SUBJECT SHOULD NOT BE LEFT UNATTENDED."[30]

81.    ICE used The WRAP as a threat to those being transported on flights, especially on flights to African countries that were generally categorized as "Special High-Risk Charters."

---

[26]*Wrap Restraint System Sole Source Justification*, GOVTRIBE (July 25, 2018),
https://govtribe.com/opportunity/federal-contract-opportunity/wrap-restraint-system-sole-source-justification-192118iaowraps122.
[27] Safe Restraints, Inc., *The Wrap Safety Restraint*, https://www.saferestraints.com/the-wrap-safety-restraint.
[28] 2014 WRAP Manual, *supra* note 9, at 10.
[29] Safe Restraints, Inc. *'The Wrap' Application Manual* (Nov. 2020),
https://web.archive.org/web/20211029194853/https://www.saferestraints.com/wp-content/uploads/2021/02/The-WRAP-Safety-Restraint-Application-Manual-2020.pdf.
[30] *The Wrap Restraint*, AM. EFFECTIVE LAW ENF'T, https://www.aele.org/law/2008ALL12/wrap.pdf.

82.    Documentary video footage taken by individuals given "exclusive access to ICE/ERO during the last year of Trump's presidency" show a flight classified as a Special High-Risk Charter to West Africa.[31] Officers laid out The WRAP for all individuals on the flight, as still footage captured from the documentary shows.





ICE officers put the top portion of the WRAP on each person being deported,

---

[31] Beyond Borders, *World's Toughest Border Patrol*, YOUTUBE (May 22, 2022), https://www.youtube.com/watch?v=neHKavfACeo; Beyond Borders, *Deported to West Africa via Private Jet*, FACEBOOK (Jun. 2, 2022) https://www.facebook.com/watch/?v=965745807433961.



and loaded one person onto the plane in The WRAP.



### ii.  <u>Use of Force and Restraints Requirements</u>

83.    Officers violated binding law and policies and disregarded manufacturer guidance in their use of The WRAP on Mr. Tendo.

84.    The U.N. Committee Against Torture recognizes that "positional abuse when handcuffed or bound" is a form of torture.[32] Both the Special Rapporteur on Torture and the

---

[32] Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Manfred Nowak: Mission to Sri Lanka, General Assembly, Human Rights Council, 7th Session, U.N. Doc. A/HRC/7/3/Add.6 (2008); *see also Aksoy v. Turkey* 23 Eur. H.R. Rep. 553 (1997).

Committee against Torture have condemned methods of restraint that are inherently inhuman, degrading, or painful, or have such effects.[33]

85.    The U.S. Supreme Court has also found that restraining individuals in stress positions violates the Eighth Amendment's guarantee against cruel and unusual punishment, and that state actors had fair warning that conduct including "forcing inmates to . . . maintain awkward positions for prolonged periods" violated the Constitution.[34]

86.    Port Isabel Detention Center operates under ICE's 2011 Performance Based National Detention Standards ("PBNDS 2011"). ICE's Office of Detention Oversight also reviews the Alexandria Staging Facility under the PBNDS 2011 (2013 Errata).[35]

87.    ICE's policy on the Use of Force and Restraints (the "Force Policy"), issued as part of the PBNDS 2011, states that staff shall attempt to gain a detained individual's willing cooperation before using force. ICE officers did not attempt to secure Mr. Tendo's willing cooperation before they violently restrained him with The WRAP on two occasions.

88.    The Force Policy further states that "staff may immediately use restraints, if warranted, to prevent a detainee from harming self or others or from causing serious property damage,"[36] and officers "shall use only the degree of force necessary to gain control of the detainee."[37] Mr. Tendo posed no risk to himself or others, or to any surrounding property, when ICE twice put him into The WRAP, in contravention of the Force Policy.

---

[33] U.N. Comm. Against Torture, Report of the Committee Against Torture, 23rd/24th Session, ¶ 180(c), U.N. Doc. A/55/44 (2000); *see also* Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, General Assembly, 68th Session, ¶ 58, U.N. Doc. A/68/295 (2013).
[34] *Hope v. Pelzer*, 536 U.S. 730, 742 (2002).
[35] Off. Det. Oversight, U.S. Dep't Homeland Sec., *Compliance Inspection of the Alexandria Staging Facility* (Aug. 2-4, 2022) https://www.ice.gov/doclib/foia/odo-compliance-inspections/alexandriaStagingFacAlexandriaLA_Aug2-4_2022.pdf.
[36] Immigr. & Customs Enf't, U.S. Dep't Homeland Sec., *2011 Operations Manual ICE Performance-Based National Detention Standards*, (2011) at 202 [hereinafter Force Policy].
[37] *Id.* at 200.

-23-

89.     According to the Force Policy, "[r]estraints shall be applied for the least amount of time necessary to achieve the desired behavioral objectives."[38] On both occasions when Mr. Tendo was subjected to The WRAP, he remained in The WRAP for hours, long after there was any need for him to be restrained and despite his compliance with ICE officers.

90.     The Force Policy prohibits the use of restraints "[t]o cause physical pain or extreme discomfort."[39] It stresses that "[u]nder no circumstances shall staff use force or apply restraints to punish a detainee."[40]

91.     The use of The WRAP on Mr. Tendo was in contravention of this policy. For example, during the trip from Port Isabel to the Laredo airport, ICE agents improperly and negligently used the WRAP to pull Mr. Tendo's chest toward his legs at a forty-five-degree angle, instead of the ninety-degree upright angle intended by the manufacturer.

92.     ICE's application of the restraints was unnecessarily tight and were improperly applied over shackles, which are not utilized in any Safe Restraints guidance and apply multiple levels of restraints that cause unnecessary harm.

93.     For detainees with special medical or mental health needs, the Force Policy states that "the appropriate medical or mental health staff shall be consulted prior to the calculated use of force."[41] A calculated use of force must be authorized in advance and requires medical staff to first review the detainee's medical file "for a disease or condition that an intermediate force weapon could seriously exacerbate, including, but not limited to, asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or

---

[38] *Id.* at 202.
[39] *Id.* at 202.
[40] *Id.* at 202.
[41] *Id.* at 205.

congestive heart failure."[42] On information and belief, no such medical assessment was done for Mr. Tendo before using The WRAP.

94.     Instead, ICE officers applied The WRAP even though, under binding policies, Mr. Tendo should have had his medical summary accompanying him during transit and transfers.[43] ICE knew about medical conditions making use of The WRAP inappropriate. When there is an "immediate-use-of-force" situation, "staff shall seek the assistance of qualified health personnel to immediately" determine if the detainee needs continuing care, examine the detainee, and provide any necessary medical services.[44] No such examination was made for Mr. Tendo.

95.     Furthermore, an email from ICE spokesperson Mary G. Houtmann, dated December 14, 2020, stated that The WRAP was to be used "[o]nly during the instances when a deportee on an ICE Air flight becomes non-compliant, poses a risk to himself and/or others onboard the flight . . . for the safety and security of all onboard the aircraft." On information and belief, subjecting Mr. Tendo to The WRAP in the detention center and during land transfers to an airport violated ICE policies regarding use of The WRAP.

96.     The Force Policy also states that physical force "shall only be used, when both necessary and reasonable," and "to the minimum extent necessary to restore order, protect safety, and provide security."[45] Mr. Tendo was improperly subject to physical force by ICE officers when they used extreme physical force to place him in the WRAP by kneeling on his neck.

---

[42] *Id.* at 205.

[43] Immigr. & Customs Enf't, U.S. Dep't Homeland Sec., *ICE Air Operations Handbook* at 11 (citation omitted).

[44] Force Policy, *supra* note 36, at 206.

[45] *Id.* at 200.

**E.    Defendants DHS and ICE's Pattern of Unnecessary Use of Force**

97.    DHS and ICE agents' use of The WRAP during transfers leading up to Mr. Tendo's planned deportation date reflects a pattern and practice of DHS and ICE agents improperly using force and restraint devices and ignoring signs of pain and suffering.

98.    DHS and ICE have historically sought to avoid disclosure of internal investigations of abuse, including by CRCL. However, some information has been made public. In response to a FOIA lawsuit, NPR received reports from experts engaged by CRCL to explore allegations of abuse and other harmful and inappropriate conduct occurring in ICE facilities.[46] These reports detailed "'negligent' medical care (including mental health care), 'unsafe and filthy' conditions, racist abuse of detainees, inappropriate pepper-spraying of mentally ill detainees and other problems that, in some cases, contributed to detainee deaths."[47]

99.    For instance, one report obtained by NPR detailed an incident at the Etowah County Jail in 2017. The investigator found that, during this incident, an officer tased a Nigerian detainee during an interaction at the top of a staircase. The detainee suffered a serious head injury and was rendered unconscious. Despite the detainee's unconscious state, the officer yelled at the detainee to move. When the detainee could not satisfy the officer's demands, the officer threatened to tase the detainee again. The officer then moved the detainee, which could have caused serious permanent neck or spine injury. The investigator found that, while use of the taser was initially appropriate, the officer did not deploy the taser according to ICE policy and placed the detainee in danger. ICE eventually discontinued use of Etowah in 2022 due to "a long history of serious deficiencies identified during facility inspections."[48]

---

[46] Dreisbach, *supra* note 5.

[47] *Id.*

[48] Press Release, U.S. Immigr. & Customs Enf't., *ICE to Close Etowah Detention Center* (Mar. 25, 2022), https://www.ice.gov/news/releases/ice-close-etowah-detention-center.

-26-

100.    Others have gathered information regarding treatment on ICE Air deportation

flights.  On April 3, 2016, ICE deported 85 Bangladeshis, Nepalis, and Indians on an ICE charter

flight. During interviews with The Guardian, individuals on those flights reported that ICE used

"body bags" (believed to be the restraint blankets similar to The WRAP employed by ICE at the

time). ICE agents reportedly pinned people to the ground, forced them into the tightly fastened

blankets, and carried people onto the plane. Others reported that ICE used tasers to force

compliance. People on the flight stated that ICE's use of force left many with visible signs of

injury. ICE admitted to using "minimal force," including the restraint blankets.[49]

101.    On December 7, 2017, ICE attempted to deport 92 people to Somalia on an

ICE-chartered flight. The flight was unable to land in Somalia and had to return to the U.S.

Somalis on the flight reported being in five-point shackles for over forty hours, being forced to

urinate in bottles or on themselves, and being threatened and beaten by ICE officers.[50] Some who

protested or stood up to ask a question were reportedly placed in full-body restraints such as The

WRAP.[51] The Somalis sued ICE for inhumane conditions and egregious abuse on the plane.[52]

102.    The University of Washington's Center for Human Rights (UWCHR) also

issued findings about ICE Air and removal proceedings based on a comprehensive review of data

obtained through FOIA requests, online research, and interviews. Through a FOIA request,

UWCHR received a 58-page document containing allegations of abuse between September 2007

---

[49] Aviva Stahl, *South Asian Migrants Say They Were Put in 'Body Bags' for Deportation from Us*, THE GUARDIAN (May 27, 2016), https://www.theguardian.com/us-news/2016/may/27/south-asian-migrants-body-bags-deportation-us.

[50] Maryam Saleh, *Excessive Force: ICE Shackled 92 Somalis for 40 Hours on a Failed Deportation Flight. That Was Just the Start of the Abuse*, The Intercept (Mar. 4, 2018), https://theintercept.com/2018/03/04/somali-deportation-flight-ice-detention-center/.

[51] *Id.*

[52] *See* Ibrahim v. Acosta, No. 17-CV-24574, 2019 WL 1206327 (S.D. Fla. Mar. 14, 2019).

and January 2019.[53] This document included 99 different complaints filed with CRCL containing allegations of mistreatment that occurred during or in connection with ICE Air and removal flights.

103.    For example, on June 2, 2017, CRCL received a complaint alleging that, on a flight from Louisiana to Arizona, an officer choked a detainee after the detainee requested food. The complaint further alleged that an officer purposefully tripped a handcuffed detainee. Detainees reported these actions after arriving in Arizona, but the officers refused to acknowledge the incidents occurred. On May 23, 2018, CRCL received a complaint from an individual detained at Prairieland Detention Center in Texas alleging that people being deported to Ghana were forced to spend the whole 14-hour flight in shackles. On October 23, 2018, CRCL received a complaint alleging that ICE officers caused a detained individual's head to hit the pavement multiple times while forcing him out of a vehicle during transit to the airport, causing profuse bleeding.

104.    These and dozens of other complaints reflect ICE's repeated use of excessive force and unnecessary restraints during detention and deportation. ICE agents deployed similar forceful tactics against Mr. Tendo during his detention and planned deportation. ICE's inappropriate and unnecessary methods caused Mr. Tendo intense physical pain and emotional distress.

---

[53] Dep't Homeland Sec., *ICE Matters with Flights in the Summary* (2019),
https://jsis.washington.edu/humanrights/wp-content/uploads/sites/22/2019/08/2019-HQFO-00350.pdf.

## CLAIMS FOR RELIEF

### COUNT I: ABUSE OF PROCESS
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)

105.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

106.    Under Texas, Louisiana, and Arizona law, abuse of process occurs when an individual has an ulterior purpose and takes a willful action to use legal process in a manner that is not proper in the regular conduct of the proceeding.

107.    The federal employees, officials, and agents referenced above abused legal processes within their control for the unlawful purposes of traumatizing Plaintiff so that he would abandon his lawful applications for asylum, withholding of removal, Convention Against Torture (CAT), as well as his parole and custody review requests, and to deter future migrants from seeking refuge in the United States.

108.    Plaintiff was injured by Defendants' misconduct, including, but not limited to, Defendants' agents using unlawful force and withholding medical treatment and basic necessities.

109.    Under the Federal Tort Claims Act, the United States is liable to Plaintiff for abuse of process.

### COUNT II: NEGLIGENT SUPERVISION
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)

110.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

-29-

111.    Under Texas, Louisiana, Arizona, and D.C. law, negligent supervision occurs when the defendant is negligent by breaching a duty of care owed to the plaintiff that proximately results in injury.

112.    Plaintiff suffered damages from the foreseeable misconduct of federal employees and agents supervised by the defendant. The government's employees in supervisory roles have a duty to properly supervise detention officers and to oversee their treatment of immigrants in their custody.

113.    The blatant disregard for ICE's own internal policies and regulations, described above and demonstrated by Defendants' agents' behavior, including but not limited to:

a. Failing to care for Plaintiff in accordance with the Detention Standards and the Force Policy referenced above;

b. Failing to provide medical care to Plaintiff;

c. Failing to exercise adequate care in restraining Plaintiff, including unnecessary force; and

d. Failing to provide basic necessities to Plaintiff during transport by land and air, including water, food, and access to the restroom.

114.    The actions listed above show that ICE and DHS staff were negligent in their non-discretionary duties to supervise individual officers. The government knew or should have known of these behaviors and nevertheless failed to adequately supervise the individual officers.

115.    The government's negligent supervision proximately caused the unlawful conduct described herein.

116.    As a proximate result of the failure to supervise, Plaintiff suffered severe pain, physical injury, and emotional distress.

-30-

117.    Under the Federal Tort Claims Act, the United States is liable to Plaintiff for negligent supervision.

## COUNT III: NEGLIGENCE
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)

118.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

119.    In Texas, Louisiana, and Arizona, negligence occurs when: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached the requisite duty of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; and (4) the risk, and harm caused, was within the scope of protection afforded by the duty breached.

120.    The federal employees, officials, and agents referenced above had a duty to Plaintiff to act with ordinary care and prudence so as not to cause harm or injury to Plaintiff.

121.    Additionally, the federal employees, officials, and agents referenced above owed Plaintiff a heightened duty of care, including a duty to provide appropriate medical care, because at all times relevant to this complaint, they had custody over Plaintiff.

122.    Defendants engaged in the negligent and careless acts and/or omissions described in detail above, as well as additional acts, including, but not limited to:

a.  Failing to care for Plaintiff in accordance with the ICE Detention Standards and Force Policy;

b.  Failing to provide adequate medical care to Plaintiff;

c.  Failing to exercise adequate care in restraining Plaintiff, including using force and leaving Plaintiff in improperly applied restraints for hours at a time; and

d.  Failing to provide basic necessities to Plaintiff during transport by land and air, including water, food, and access to the restroom.

123.    As a direct and proximate result of Defendant's agents' negligent conduct,

Plaintiff suffered substantial injuries, including but not limited to pain, physical injury, and

emotional distress.

124.    Under the Federal Tort Claims Act, the United States is liable to Plaintiff for

negligence and negligent infliction of emotional distress.

## COUNT IV: BATTERY
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)

125.    All preceding paragraphs are hereby incorporated by reference as if fully set forth

herein.

126.    Under Texas, Arizona, and Louisiana law, a battery occurs when an individual

makes harmful or offensive contact with a person, resulting from an act intended to cause the

plaintiff to suffer such contact.

127.    As detailed above, the federal employees, officials, and agents referenced above

intentionally engaged in unlawful and unjustified harmful or offensive contact with Plaintiff by

engaging in the following acts, which include, but are not limited to:

    a.  Using unnecessary force and unnecessary restraints on Plaintiff while in detention;
        and

    b.  Using unnecessary force and unnecessary restraints on Plaintiff during land and air
        transport prior to a planned deportation flight;

128.    As a direct and proximate result of Defendant's agents' harmful or offensive

contact, Plaintiff suffered the injuries detailed above, including substantial physical injury, as

well as lasting emotional distress.

129.    Under the Federal Tort Claims Act, the United States is liable to Plaintiff for battery.

## COUNT V: ASSAULT
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)

130.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

131.    Under Texas, Louisiana, and Arizona law, assault is threat of battery.

132.    As detailed above, the federal employees, officials, and agents referenced above intentionally, knowingly, or recklessly threatened or caused harmful or offensive contact with Plaintiff by engaging in the following acts, which include, but are not limited to:

    a.  Using unnecessary force and unnecessary restraints on Plaintiff; and

    b.  Failing to take steps to seek appropriate medical care after using unnecessary force and unnecessary restraints.

133.    As a direct and proximate result of Defendant's agents' threat of harmful or offensive contact, Plaintiff suffered injuries, including among other things, substantial physical injury as well as lasting emotional distress.

134.    Under the Federal Tort Claims Act, the United States is liable to Plaintiff for assault.

## COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)

135.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

136.    Under Texas, Louisiana, Arizona, and D.C. law, intentional infliction of emotional distress occurs where the defendant intentionally or recklessly engages in extreme and outrageous conduct that caused the plaintiff severe emotional distress.

137.    The federal employees and officers referenced above intentionally or recklessly engaged in extreme and outrageous conduct that inflicted severe emotional distress on Plaintiff.

138.    Plaintiff was subject to verbal and physical abuse for the purpose of terrorizing him.

139.    Plaintiff suffered severe emotional distress and mental anguish as a result of this conduct.

## COUNT VII
### 5 U.S.C. § 702: Violation of the Administrative Procedure Act and *Accardi* Doctrine

140.    Pursuant to the *Accardi* doctrine, if an agency fails to follow its own standards, "the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). "Agencies cannot relax or modify regulations that provide the only safeguard individuals have against unlimited agency discretion." *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003).

141.    Plaintiff suffered isolation, forced fingerprinting, impermissible use of restraints, unnecessary force, and denials of healthcare, including treatment for both pre-existing conditions and injuries suffered in custody, while detained in DHS and ICE custody and during transportation by land and air prior to a planned deportation.

142.    Defendants DHS and ICE failed to comply with and ensure compliance with their own policies regarding removals, use of force, and health care, as set out in the PBNDS. Defendants' failure to act was a final agency action that caused Plaintiff injuries in fact.

-34-

143.   As explained in more detail above, using unnecessary force on detainees violates
the PBNDS. PBNDS Standard 2.15 authorizes DHS agents to use reasonable and necessary force
only after all other reasonable efforts to resolve the issue have failed. Part 2.15, pg. 200.
Restraint devices "shall only be used as a precaution against escape during transfer; for medical
reasons, when directed by the medical officer; or to prevent self-injury, injury to others, or
property damage." Part 2.15, pg. 202. The PBNDS further provides that "restraints shall be
applied for the least amount of time necessary to achieve the desired behavioral objective. Part
2.15, pg. 202. Additionally, the PBNDS states that restraint equipment or devices, such as
handcuffs, may not be used to cause physical pain or discomfort. Part 2.15, pg. 202.
Unnecessarily tight restraints are prohibited. Part 2.15, pg. 202.

144.   When DHS and ICE subject a detained individual to the use of force, that
individual "shall be seen by medical staff as soon as possible." Part 2.15, pg. 202.  If a detained
individual suffers an injury because of the use of force, "a medical evaluation shall be obtained
and appropriate care provided." Part 2.15, pg. 202.

145.   Failing to provide proper medical treatment and timely healthcare services
violates the PBNDS. According to PBNDS Standard 4.3, detained individuals "shall have access
to a continuum of healthcare services, including screening, prevention, health education,
diagnosis, and treatment. Part 4.3, pg. 257. Additionally, detained individuals "shall be able to
request health services on a daily basis and shall receive timely follow-up. Part 4.3, pg. 257.
Detention facilities are also required to timely respond to medical complaints and take detained
individuals' medical needs into account before transferring them to other facilities. Part 4.3, pgs.
260, 276.

146.    Defendants DHS and ICE's failure to properly enforce their own use of force, medical care, and removal policies subjected Plaintiff to ongoing, severe physical pain and emotional distress.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) award Plaintiff all available compensatory damages in an amount to be proven at trial;

(2) declare that the conduct of Defendants DHS and ICE, as alleged in the Complaint, violated their own agency policies and regulations and thus violates the Administrative Procedure Act;

(3) award attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(4) grant such other relief as the Court deems just and equitable.

Dated: September 28, 2023

*Respectfully submitted,*

Erika L. Johnson, Vermont Bar #5695
354 Manhattan Dr., Unit 3
Burlington, VT 05401
(802) 399-8520
erika.johnson.law@gmail.com

Fatma E. Marouf*
Ana Martinez, Law Student**
IMMIGRANT RIGHTS CLINIC,
TEXAS A&M SCHOOL OF LAW
307 W 7th St., Suite LL50
Fort Worth, TX 76102
(817) 212-4123
fatma.marouf@law.tamu.edu

Hassan Elsouri*
Elsouri Law & Consultants, PLLC
3700 Massachusetts Ave. NW
Washington, D.C. 20016
(313) 736-5411
hassan@elsourilaw.com

*Attorneys for Plaintiff*

*\*Pro hac vice* petition or Attorney Admission
Petition forthcoming
\*\* Petition for certification of law student
forthcoming