UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
STEVEN TENDO,                     :
                                 :
         Plaintiff,              :
                                 :
v.                               :   Case No. 2:23-cv-438
                                 :
UNITED STATES OF AMERICA, UNITED :
STATES DEPARTMENT OF HOMELAND    :
SECURITY, ALEJANDRO N. MAYORKAS, :
U.S. IMMIGRATION AND CUSTOMS     :
ENFORCEMENT, and PATRICK         :
LECHLEITNER,                     :
                                 :
         Defendants.             :
```

## OPINION AND ORDER

Plaintiff Steven Tendo alleges that since he arrived in the United States on December 20, 2018, he has been detained and abused by federal officers in several different contexts. He filed the instant Complaint, ECF No. 1, on September 28, 2023, against various government actors (collectively "the Government" or "Defendants") alleging that these abuses amount to abuse of process, negligent supervision, negligence, battery, assault, and intentional infliction of emotional distress under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), and violation of the Administrative Procedure Act, 5 U.S.C. § 702. Defendants have filed a motion to change venue or, in the alternative, to dismiss the case. For the following reasons,

Defendants' motion to change venue is denied and their motion to dismiss is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Factual Background[1]

Plaintiff Steven Tendo is originally from Uganda. He fled the country after "numerous arrests and torture." ECF No. 1 at 7. As part of this abuse, "Ugandan officials cut off two fingers on his left hand, burnt his legs and feet, and shot him in the leg." *Id.*

Tendo arrived in Brownsville, Texas, seeking asylum on December 20, 2018. He was detained by United States Immigration and Customs Enforcement ("ICE") at Port Isabel Detention Center ("PIDC") in Los Fresnos, Texas.

Tendo is diabetic. When he entered PIDC, ICE agents were aware of his medical condition. Tendo initially had medical supplies with him, including a finger-prick device (used to test his blood sugar levels twice daily) and other diabetes-related medication. ICE confiscated these items when he entered custody and scheduled blood sugar testing for once every three months.

---

[1] For purposes of the motion to dismiss, all facts are taken from Plaintiff's complaint and are assumed to be true. *See Melendez v. Sirius XM Radio, Inc.,* 50 F.4th 294, 307 (2d Cir. 2022); ("In addressing the sufficiency of a complaint we accept as true all factual allegations and draw from them all reasonable inferences.") (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013)).

It also changed his medication and "denied" him a diet suitable for diabetes (despite numerous requests for a more appropriate diet). Tendo states that as a result of this treatment his diabetes "became uncontrolled, and his blood sugar levels fluctuated dangerously." *Id.* at 7-8. He frequently felt hungry or dizzy and lost nearly thirty pounds.

By April of 2020, Tendo had developed a cataract in his right eye. He was also suffering from "numbness and tingling in his extremities," boils all over his body, and lesions.[2] *Id.* at 8. When Tendo saw an eye specialist in early April of 2020, that professional recommended surgery to remove the cataract "caused by Mr. Tendo's uncontrolled diabetes." *Id.* But that surgery could not be scheduled because of a ban on "elective surgeries" during the COVID pandemic. *Id.*

Tendo's lawyer arranged for several non-ICE doctors to review Tendo's medical records. The first, Dr. Lazlo Madras, stated that "metformin"[3] is "an insufficient single medication"

---

[2] Tendo states that these lesions are often caused by infection with methicillin resistant Staph Aureus ("MRSA"), which "spreads rapidly in prison or detention settings." He also states that diabetic individuals are at elevated risk of serious life-threatening infections from MRSA. ECF No. 1 at 8.

[3] Apparently this is Tendo's ICE-provided diabetes medication. *Costin v. Glens Falls Hosp.*, 103 F.4th 946, 952 (2d Cir. 2024) (noting that when evaluating a motion to dismiss, a court "draw[s] all reasonable inferences in the plaintiff's favor.") (quoting *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)).

if "while taking it correctly, [Mr. Tendo's] blood glucose [was] over 500." *Id.* at 8 (cleaned up). Dr. Madras also stated that Tendo's "inadequate medical care . . . placed him at 'very high' risk of 'diabetic retinopathy (development of vision problems), diabetic neuropathy (loss of nerve function and feeling in his feet and hands), and diabetic nephropathy (kidney failure leading to dialysis).'" *Id.* at 8-9. Another doctor, Marsha Griffin, reviewed Tendo's medical records on April 15, 2020, and concluded that his condition placed him at "grave risk for infection of any kind due to a weakening immune system." *Id.* at 10. She also concluded that his cataract was caused by "uncontrolled blood glucose levels," and that the infection "which appeared to be causing the boils on [Tendo's] skin" could cause serious issues if it spread to vital organs. *Id.*

Tendo also states that diabetic individuals are at heightened risk from COVID, and that ICE did not segregate detainees exhibiting COVID-19 symptoms from the general facility. *Id.* at 9. Tendo spoke up about ostensibly unsanitary and unsafe conditions at the facility and was placed in "the hole," a solitary confinement room that was kept freezing cold, for approximately two days. He states that he was "not provided with a blanket and fainted due to his compromised health." *Id.* When Tendo later experienced COVID-like symptoms, he "did not

tell anyone for fear of being sent back to 'the hole' again."
*Id.*

By July of 2020, Tendo was extremely sick and passed out at
PIDC. Blood tests revealed that he had "a neutrophil count of
zero, indicating severe neutropenia, a life-threatening
condition." *Id.* at 10. This condition may have been "caused or
exacerbated" by medication provided in detention. Tendo was
taken to the hospital for one night.

Concerned with health complications relating to diabetes
and COVID, Tendo and his representatives took action. He sought
to be released on parole twice in April of 2020. Both requests
were denied. *Id.* at 10. His lawyer filed a complaint with the
Department of Homeland Security ("DHS") Office of the Inspector
General regarding Tendo's inadequate medical care at PIDC. *Id.*
at 15-16. Amnesty International issued requests for action on
Tendo's behalf on June 30, August 26, and September 2, 2020. *Id.*
at 16. Robert F. Kennedy Human Rights similarly called on DHS to
release Tendo on July 30, 2020. *Id.*

The media campaign appeared to have borne fruit: on August
18, 2020, "forty-four members of Congress sent a letter to Chad
Wolf, Acting Secretary of DHS," calling for Tendo's immediate
release on medical parole. *Id.* at 16-17. News programs discussed
Tendo's detention, and an online petition for his release
received over 500 signatures by September 3, 2020. *Id.* at 17.

Tendo was scheduled to have cataract surgery on September 3, 2020. On August 30, 2020, a group of ICE officers entered Tendo's room at PIDC and informed him that he was being transferred. *Id.* at 11. He refused due to his scheduled surgery and a pending immigration appeal. The officers then "knocked him down and pushed his face onto the floor. One officer knelt on his neck while another cuffed his hands behind his back. His ankles were also cuffed. Then he was flipped onto his back and wrapped up in what felt like a bag while still shackled." *Id.* The officers did not "check to see if Mr. Tendo needed medical care before restraining him." *Id.*

Tendo now believes that the device used to restrain him is called "the WRAP." The WRAP "binds the legs together, with the arms cuffed at the back. It is supposed to leave the restrained individual seated, upright, in a 90-degree position so that the lungs and airways are free from compression." *Id.* at 12. However, in Tendo's case, a strap that connected the front of his torso to his legs "was cinched up to an angle of around 45 degrees, making it very hard for him to breathe, causing extreme anxiety, and inflicting excruciating pain." *Id.*

Officers "dragged" Tendo into another room at PIDC and informed him that he was being transferred to another detention facility. They then moved him, still in the WRAP, into a van. There, officers loosened the torso strap to allow his legs and

torso to bend at a 90-degree angle. *Id.* at 13. He was left there for three and a half hours while the van traveled to Laredo International Airport. Tendo "had to use all his strength not to topple over each time the bus turned a corner or bend. His wrists and thumb became numb from the pain. When he asked to use the restroom, ICE officers refused. He was forced to urinate and defecate on himself during the journey." *Id.*

Tendo's mistreatment continued from there. ICE officers re-cuffed his hands in front of his body before lifting him onto the plane and "dump[ing] him" – still in the WRAP – onto a row of seats. They tied a seatbelt around him and left him unattended for most of the flight to Alexandria, Louisiana. Tendo states that he "lost all feeling in his wrists and thumbs and was in excruciating pain." *Id.* He was not allowed to use a restroom, so he remained covered in his own excrement for the duration of the flight. *Id.* He was also denied food, water, and medication.

Two other Ugandan men on the plane told Tendo that they were being deported. At this point, Tendo realized that he was also being "transferred for deportation." *Id.* at 14.

In Alexandria, Tendo was released from the WRAP and pushed into an open shower to wash himself. He was "very hungry, thirsty, shivering, [] crying," and in "excruciating pain." *Id.* He was then placed in a glass cell and witnessed six Kenyan

7

individuals being "placed in The Wrap before their deportation from the facility. He believed the ICE officers were sending a message to everyone about what would happen if they resisted." *Id.*

Tendo was then handcuffed, returned to the WRAP, and put on a plane to Phoenix-Mesa Gateway Airport in Arizona, where he was again left unattended. Like the first flight, he was not allowed to "eat, drink, take medication, or use the restroom." *Id.* His wrists and thumbs were again "in agony from the pressure of the handcuffs and the restraint device." *Id.* Upon landing, Tendo was carried off the plane and removed from the WRAP. He witnessed three other Ugandan men being placed in the WRAP and saw ICE officers beat one of those men. *Id.* at 15. Officers then took Tendo to two different detention centers in Arizona, where he remained for roughly a week.

ICE ultimately did not deport Tendo "due to [the] widespread protests" regarding his detention and treatment. *Id.* at 18. He was able to have cataract surgery on his right eye. *Id.* However, Tendo remained in custody until February 11, 2021. During those six months, Tendo was detained in "life-threatening conditions" due to risk from COVID. His vision in his left eye also deteriorated. *Id.* Tendo acknowledges that due to "the outpouring of support and Congressional concern for his case," his medical care improved towards the end of his detention: his

glucose levels were monitored daily, and his diet was upgraded. *Id.* However, he remained in pain from nerve damage to his calves and deep bruising on his ankles caused by the WRAP. *Id.* at 19.

Tendo's detention caused some lasting injuries. He "continued to experience problems with his vision due to the eye damage that occurred during his detention" and remained sensitive to light. *Id.* He eventually had surgery to repair his vision which rendered him unable to work for two months after his release. *Id.* He also suffered from severe headaches, required extensive dental work due to the deterioration of his teeth, and received mental health care and physical therapy "to cope with the emotional and physical harm he suffered in ICE custody." *Id.*

## II.  Procedural Background

An immigration judge denied Tendo's application for asylum on June 24, 2019. That judgment was affirmed by the Board of Immigration Appeals ("BIA") on December 12, 2019. ECF No. 1 at 11. Tendo filed a motion to reopen on December 19, 2019, which remained pending for the duration of his time in custody. *Id.* The BIA ultimately denied that motion. ECF No. 24 at 10. Tendo then moved the BIA to reconsider its denial of his motion to reopen, which it also denied. *Id.* Tendo appealed to the Fifth Circuit, which rejected his claims. *Tendo v. Garland*, No. 20-60038, 2022 WL 3031310, at *1 (5th Cir. Aug. 1, 2022).

While these immigration proceedings were pending, Tendo waged a parallel litigation campaign in the Southern District of Texas. He filed a petition for habeas corpus and moved for a temporary restraining order ("TRO") in April of 2020. *Tendo v. Rodriguez, et al.* (*Tendo I*), 1:20-cv-60 (S.D. Tex.). After his TRO request was denied in May of 2020, Tendo voluntarily dismissed those claims. *Id.* at ECF No. 49. He then filed a *Bivens* action in the same court, again requesting a TRO. *Tendo v. Longoria, et al.*, (*Tendo II*), 1:20-cv-120 (S.D. Tex.). That request was also denied, *id.* at ECF No. 30, and the court ultimately granted the defendants' motion to dismiss on qualified immunity grounds. *Id.* at ECF No. 34.

On August 3, 2022, Tendo filed a Standard Form 95 administrative tort claim with ICE. *See* ECF No. 24-4. That claim was supported by an affidavit, signed by Tendo, detailing ICE's "severe medical negligence." *Id.* at 6. ICE requested additional information, ECF No. 24-5, and counsel for the Government attests that Tendo's counsel never responded. ECF No. 24-1 at 2. ICE then denied Tendo's administrative tort claim. ECF No. 24-6. This lawsuit followed.

## DISCUSSION

### I.   Defendant's Motion to Dismiss

**A. Legal Standard**

The Government requests dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "A court properly dismisses an action under Rule 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it.'" *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. *Makarova*, 201 F.3d at 113. The Court must "take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). It may consider materials beyond the pleadings in order to resolve the jurisdictional issue. *Makarova*, 201 F.3d at 113.

The Government's motion to dismiss for failure to state a claim, filed pursuant to Rule 12(b)(6), requires a plaintiff to allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

In deciding a motion to dismiss filed under Rule 12(b)(6), a court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, a court need not accept as true "[l]egal conclusions, deductions or opinions couched as factual allegations." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

**B. The FTCA**

Tendo brings this action in part under the FTCA. "Section 2679(b)(1) of the FTCA . . . provides that a suit against the United States is the exclusive remedy for a suit for damages for injury or loss of property 'resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.'" *Rivera v. United States*, 928 F.2d 592, 608 (2d Cir. 1991) (quoting 28

U.S.C. § 2679(b)(1)). The United States government is the only available defendant under the FTCA's waiver of sovereign immunity. *Id.* at 609 ("[S]uit against the United States [is] the exclusive remedy [under § 2679].""). Accordingly, Tendo's FTCA claims are dismissed to the extent they are brought against non-United States defendants.

*a. Presentment*

The FTCA has a presentment requirement. It states that a claimant may not bring an action under the statute "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency." 28 U.S.C. § 2675(a). This administrative exhaustion requirement is jurisdictional. *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005). To satisfy the presentment requirement, a claimant must have provided the reviewing agency with "sufficiently specific information as to the basis for his claim, the nature of his injuries, and the amount of damages sought that the agency can reasonably understand what it must probe to determine liability, to value the claim, and to assess the advisability of settlement." *Collins v. United States*, 996 F.3d 102, 119 (2d Cir. 2021) (citing *Romulus v. United States*, 160 F.3d 131, 132 (2d Cir. 1998)).

The Government asserts that Tendo's SF-95 administrative claim "expressly limited [Tendo's] WRAP-related claims to the alleged conduct of a single day," the day on which he was transported from PIDC to Alexandria, Louisiana. Accordingly, it argues that any of Tendo's WRAP-related allegations from the ensuing deportation proceedings are waived. It also argues that Tendo may not now assert claims of medical negligence from his resumed detention after the attempted deportation.

The Court concludes that for purposes of the motion to dismiss, Tendo's SF-95 submission satisfies the FTCA's presentment requirement for his deportation-related claims but not for alleged medical negligence taking place after September of 2020. As the Second Circuit explained in *Collins*, the presentment requirement is "one of notice, not proof." *Id.* at 110. The question is whether the agency was presented with "sufficiently specific information . . . to permit [it] to conduct an investigation and then to estimate the value of the claim." *Id.* at 114.

Here, Tendo's SF-95 form alleges deportation-related misconduct from more than just his initial transport from PIDC to Alexandria, Louisiana. To be sure, that portion of the SF-95 describes the transport events in the greatest detail. *See* ECF No. 24-4 at 6-7. But it also states that when Tendo was taken

14

out of the WRAP at Laredo International Airport[4] prior to his
transport to Louisiana he "remained in five-point restraints,"
could barely walk, lost feeling in his hands and wrists, and was
in extreme pain. *Id.* at 7. The SF-95 goes on to state that Tendo
was flown to Louisiana, put in a tiny glass cell, and forced to
watch others be placed in the WRAP. *Id.* at 7. It also claims
that he was then flown to Mesa, Arizona, "where he witnessed
three more men subjected to The WRAP, all Ugandans. Mr. Tendo
saw one of the men being beaten before being placed in The
WRAP." *Id.*

This affidavit put ICE on notice that Tendo was asserting
tort claims related to the attempted deportation in Texas,
Louisiana, and Arizona. ICE was also on notice that those claims
related to use of the WRAP device, and emotional distress from
the chain of events beginning at PIDC and culminating in
Arizona. Tendo has done more than submit a "conclusory form that
provides no information." *Collins*, 996 F.3d at 111 (quoting
*Romulus v. United States*, 983 F. Supp. 336, 337 (E.D.N.Y.
1997)). His SF-95 asserted extreme pain and loss of feeling in

---

[4] Tendo's Complaint states that he was kept in the WRAP when he
was put on the plane. ECF No. 1 at 12. This discrepancy poses a
credibility issue, not a presentment issue. An FTCA plaintiff
need not have previously detailed every factual allegation in a
complaint in a prior administrative proceeding. Again, the issue
is whether the agency had enough information to conduct an
investigation and assess the possibility of settlement. *Collins*,
996 F.3d at 110.

his wrists from prolonged restraint, ECF No. 24-4 at 7, injuries
that are comparable to those outlined in the Complaint.
Specifically, he alleges that his initial placement in the WRAP
caused "excruciating pain," ECF No. 1 at 12, that he lost
feeling in his extremities, *id.* at 13, that he was terrified
when placed in glass cell and forced to witness others placed in
the WRAP, *id.* at 14, and that he saw other deportees abused by
ICE officers. I*d.* at 15. The deportation-related allegations in
the Complaint are substantially similar in kind to those alleged
in the SF-95. Accordingly, Tendo has satisfied his presentment
obligation. 28 U.S.C. § 2675(a); *see also Collins*, 996 F.3d at
111 (stating that a plaintiff "need not provide all possible
information" to satisfy presentment) (citing *Romulus v. United
States*, 983 F. Supp. 336, 337 (E.D.N.Y. 1997)).

Counsel for the Government submitted a declaration
attesting that "ICE requested that Tendo's counsel provide ICE
with additional information to complete the presentation of
Tendo's administrative tort claim," but that Tendo's counsel did
not respond to that request. ECF No. 24-1 at 2. Failure to
provide follow-up information can show that a plaintiff has not
satisfied the FTCA's presentment requirement. *See Collins*, 996
F.3d at 11 (citing with approval a lower court decision
dismissing an action when the claimant "simply refus[ed] to
provide an agency with any information to investigate the

claim"). But the Government does not state what additional information it would have needed to adequately investigate Tendo's claim. Indeed, all of ICE's requests in its follow-up letter to Tendo's counsel dealt with damages, not liability. *See* ECF No. 24-5 at 1-2 (requesting a written report from a doctor "setting forth the nature and extent of the treatment" and diminished earning capacity, itemized medical bills, future expected expenses, and statements of lost earnings). Tendo's failure to respond to this request did not impede ICE's ability to evaluate whether there was misconduct.[5]

The Government also argues that because Tendo's SF-95 sought redress for "medical negligence during preceding months," ICE had no "reason or opportunity to investigate or resolve Tendo's new claims of medical negligence postdating" September 1, 2020 (the date of the deportation attempt). ECF No. 24 at 16. It accordingly argues that the Court does not have jurisdiction over Tendo's medical negligence claims from his resumed detention.

---

[5] The availability of relevant information to ICE – such as witnesses and internal agency reports – also counsels in favor of finding that presentment has been satisfied. *See Collins*, 996 F.3d at 112 (explaining that presentment was satisfied when an agency could have investigated a claim because "additional information regarding the accident was available to USPS from its own identified employee Scholl; its internal records, specifically, the reports of its on-scene investigator; and from an equally accessible police accident report.").

The Court agrees that it does not have jurisdiction over Tendo's claims that relate to injuries caused by medical negligence after his attempted deportation. Tendo's SF-95 states that the "date and day of accident/incident" was "August 30, 2020 (and medical negligence during preceding months)." ECF No. 24-4 at 6. This points to a discrete time period for the alleged medical negligence: Tendo's time in custody pre-dating August 30, 2020. Similarly, in a paragraph describing the various medical issues that Tendo suffered while in ICE custody, the SF-95 specifies that Tendo was at special risk from COVID-19 because he was "kept detained until September 2020." *Id.* This indicates that the alleged medical negligence occurred prior to September of 2020. Accordingly, ICE was on notice of a potential claim against it relating to alleged medical negligence from Tendo's detention prior to September of 2020, but not afterwards.

Logically, however, medical negligence may have far-reaching health consequences that extend beyond the time period of the negligence itself. The issue of whether ICE's alleged medical negligence injured Tendo in ways that manifested later poses questions of causation and damages that the Court will resolve at later stages of litigation.

In sum, Tendo has satisfied his presentment obligations for his claims related to the attempted deportation and the medical

negligence from prior to that attempted deportation. The Court also retains jurisdiction over Tendo's injuries which resulted from the presented medical negligence but manifested later.

*b. Statute of limitations*

The Government next asserts that the FTCA's statute of limitations precludes Tendo's claim. Any tort claim brought against the United States pursuant to the FTCA must be "presented in writing to the appropriate federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). Tendo's SF-95 was submitted on August 3, 2022. The Government argues that Tendo knew of its alleged medical negligence well before August of 2020, and that his claims are accordingly barred.

Tendo counters that his medical mistreatment was part of a "continuing violation" that justifies delayed commencement of the statute of limitations. Under the continuing violation doctrine, when a plaintiff "experiences a continuous practice and policy that violates his or her rights," the commencement of the statute of limitations "may be delayed until the last violation." *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)) (cleaned up). The continuing violation doctrine applies to claims "composed of a series of separate acts that collectively constitute one unlawful [] practice." *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002). It does not apply to "discrete unlawful acts," even when those acts are part of a "serial violation." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quoting *Morgan*, 636 U.S. at 114-15).

The Second Circuit has not expressly resolved whether the continuing violation doctrine applies to the FTCA's statute of limitations. *See Syms v. Olin Corp.*, 408 F.3d 95, 108-09 (2d Cir. 2005) ("We need not decide whether a continuing tort claim might be valid under the FTCA, notwithstanding the fact that accrual is governed by federal law."). However, several other appellate courts have explained that continuing violations can delay the commencement of the FTCA's statute of limitations. *See, e.g.*, *Torres-Estrada v. Cases*, 88 F.4th 14, 24 (1st Cir. 2023); *Loumiet v. United States*, 828 F.3d 935, 947 (D.C. Cir. 2016) ("[W]e agree with Loumiet's contention that the continuing-violations doctrine displaced [the otherwise applicable statute of limitations cutoff] to render his claims timely filed."); *Alexander v. United States*, 721 F.3d 418, 425 (7th Cir. 2013); *Robinson v. United States*, 327 F. App'x 816, 818 (11th Cir. 2007) (medical mistreatment of a prisoner constituted an ongoing violation until the prisoner received surgery).[6] Given the weight of persuasive authority on the

---

[6] Some courts in this Circuit have held that "[c]ourts may apply the continuing violations doctrine in FTCA cases so long as

question, the Court concludes that the continuing violation doctrine applies to the FTCA's statute of limitations.

The Court also concludes that Tendo has pleaded a continuing violation. The Eleventh Circuit's decision in *Robinson* serves as a useful example. In that case, the court evaluated a prisoner's FTCA claim against his jailers for failing to provide adequate medical care for "his heart condition and blood pressure, his hernia, his skin disease, and his dental needs." *Robinson*, 327 F. App'x at 817. The plaintiff alleged "continued disregard of [his] need of medical treatment

---

state law recognizes the doctrine." *Monk v. United States*, No. 3:22-CV-1503 (SRU), 2024 WL 1344712, at *12 (D. Conn. Mar. 29, 2024) (citing *Syms*, 408 F.3d at 108-09). This is based on the Second Circuit's decision in *Syms*, which held that an FTCA plaintiff could not bring an action against the government under New York law regardless of whether the FTCA countenanced the continuing violation doctrine because "New York law no longer recognizes the existence of the continuing tort doctrine in latent exposure cases." 408 F.3d at 109. This seems to imply that the FTCA adopts the underlying state's law regarding the statute of limitations and the continuing violations doctrine – a view that appears to be in tension with the well-settled principle that the FTCA's statute of limitations is an issue of federal law. *See, e.g.*, *Pinilla v. United States*, 760 F. App'x 164 (4th Cir. 2019) ("The FTCA's statute of limitations and how it is applied, however, are matters of federal law."); *Miller v. Philadelphia Geriatric Ctr.*, 463 F.3d 266, 270 (3d Cir. 2006) ("The determination of when a claim accrues for the purposes of the FTCA is a question of federal law."). Regardless, Texas law recognizes a continuing tort doctrine. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 593 (Tex. 2017) (acknowledging the availability of continuing tort doctrine in "certain situations"); *see also Upjohn Co. v. Freeman*, 885 S.W.2d 538, 542-43 (Tex. App. 1994) (recognizing continuing tort doctrine for negligent sale of a drug).

for his hernia until" the date of the surgery, which occurred
within the statute of limitations, placing the prior
mistreatment of his hernia – as a continuing violation – within
the statute of limitations. *Id.* at 818. The same was true of the
plaintiff's continued exposure to the source of a scabies
infection after his initial diagnosis. *Id.*

Similarly here, Tendo's alleged medical mistreatment
ostensibly began upon his arrival at PIDC. *See* ECF No. 1 at 7
(stating that ICE delayed his diabetes testing, changed his
medication, and denied him a condition-suitable diet). It
continued at least until he got the cataract surgery. This makes
Tendo's cataract like the hernia in *Robinson*; ongoing, allegedly
caused by negligent care, and without discrete episodes
requiring commencement of the statute of limitations. *See*
*Gonzalez*, 802 F.3d at 220 ("The continuing violation doctrine
thus applies not to discrete unlawful acts, even where those
discrete acts are part of a 'serial violation,' but to claims
that by their nature accrue only after the plaintiff has been
subjected to some threshold amount of mistreatment.") (cleaned
up). ICE allegedly provided Tendo with the cataract surgery on
or after September 3, 2020, thus apparently ending the

continuing violation (at least with regard to the diabetes-induced cataract) within the limitations period.[7]

The same analysis applies to Tendo's other diabetes-related injuries, such as boils, MRSA-related lesions, neutropenia, and anemia, which allegedly continued until at least August of 2020. *See* ECF No. 1 at 16-17 (noting that Congressmembers made public statements about Tendo's health issues in detention on August 18, 2020). Because Tendo filed his SF-95 on August 3, 2022, he has satisfied the two-year statute of limitations set forth in 28 U.S.C. § 2401(b).

Similarly, Tendo has alleged a continuing violation for his ongoing exposure to COVID. His claim is similar to the *Robinson* plaintiff's claim for scabies exposure. In that case, the court found a continuing violation when the defendants continued to "expose Robinson to the source of his scabies after he was a diagnosed." 327 F. App'x at 818.  Here, accepting the facts alleged in the Complaint as true, Tendo remained exposed to the risk of infection for an extended period of time, again without specific discrete incidents of negligence requiring commencement of the statute of limitations. *Gonzalez*, 802 F.3d at 220. While

---

[7] The Complaint states that "ICE did not deport Mr. Tendo on September 3, 2020, . . . and Mr. Tendo was able to have cataract surgery on his right eye." ECF No. 1 at 18. This makes it seem like the surgery occurred on September 3, but if it did not occur until later, Tendo has still met the statute of limitations.

the Government is correct that those conditions "arose by April
of 2020," ECF No. 24 at 18, the alleged negligence continued
through the time period covered by the statute of limitations,
ECF No. 1 at 10-11, making Tendo's claim timely. *See Harris v.
City of New York*, 186 F.3d 243, 250 (2d Cir. 1999) (noting that
a continuing violation is timely if there are "non-time-barred
acts taken in furtherance of" the continuing violation).

*c. Res judicata*

    The Government next asserts a *res judicata* defense based on
*Tendo II*, 2021 WL 9477088, at *1. In that case, the District
Court for the Southern District of Texas dismissed Tendo's
claims against several individual officers on qualified immunity
grounds. *Id.* It explained that "the damages allegedly caused by
[the officers] were 'by virtue of their positions and duties,'
and ruled that none of their actions were "objectively
unreasonable in light of the legal rules that were clearly
established at the time." *Id.* (quoting *Anderson v. Creighton*,
483 U.S. 635, 639 (1987)).

    The Government now argues that ruling precludes this action
because Tendo is suing the United States over "the same
underlying facts that served as the basis for his prior suits
against government agencies and officials." ECF No. 24 at 19. In
support, it cites *Simmons v. Himmelreich*, 578 U.S. 621 (2016),

which dealt with the FTCA's judgment bar provision.[8] In a footnote of that decision, the Supreme Court explained that "the [FTCA's] judgment bar provision supplements common-law claim preclusion by closing a narrow gap: At the time that the FTCA was passed, common-law claim preclusion would have barred a plaintiff from suing the United States after having sued an employee but not vice versa." *Id.* at 630 n.5. The Government takes this to mean that common-law claim preclusion should bar Tendo from suing the United States after having sued its employees in *Tendo II.*

To assert the defense of *res judicata*, a party must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014). The doctrine of privity is a "functional inquiry," not a "formalistic" one. *Cho v. Blackberry Ltd.*, 991 F.3d 155, 169 (2d Cir. 2021) (quoting *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995)). The Government's *res judicata* defense fails on the second prong.

---

[8] Under the FTCA's judgment bar, "once a plaintiff receives a judgment (favorable or not) in an FTCA suit, he generally cannot proceed with a suit against an individual employee based on the same underlying facts." *Simmons*, 578 U.S. at 626.

First, the defendants in *Tendo II* were sued in their individual capacities. The lawsuit named two ICE officers responsible for managing healthcare at PIDC and additional "unidentified" ICE officers not yet ascertained. ECF No. 1 at 3 (Case No. 1:20-cv-120, S.D. Tex. 2020) ("*Tendo II* Docket"). Both named defendants "act[ed] under color of federal authority," but the complaint specified that they were sued in their "individual capacity[ies]" pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971). *See Tendo II* Docket ECF No. 1 at 3. It is well-established that *Bivens* actions "must be brought against the federal officers involved in their individual capacities." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994).

Individuals sued in their official capacities are not in privity with the United States Government for *res judicata* purposes.[9] *Connelly v. City of St. Albans, Vermont*, No. 2:21-CV-00291, 2023 WL 1785566, at *3 (D. Vt. Feb. 6, 2023); *see also Berman Enterprises, Inc. v. Jorling*, 3 F.3d 602, 606 (2d Cir. 1993) (holding that when a "complaint specifically seeks damages

---

[9] The Second Circuit has not directly addressed this question. *See Fabian v. Pappalardo*, 395 F. Supp. 3d 257, 264 n.2 (S.D.N.Y. 2019) (noting the absence of appellate precedent on the issue, but stating that "several other circuits have concluded there is no privity" between "a government employee sued in his or her individual capacity" and "his or her government employer for the purpose of res judicata.").

from the defendants in their individual capacities," the fact
that "the state may reimburse them does not make the state the
real party in interest."); C. Wright & A. Miller, 18A Fed. Prac.
& Proc. Juris. § 4458 (3d ed. 1998) ("[J]udgment against an
official who has litigated in his personal capacity is not
binding on his government."); *Ramirez v. Reddish*, 104 F.4th
1219, 1228 (10th Cir. 2024) (collecting cases).

This result is intuitive considering the differences
between individual and official capacity lawsuits. As the
Supreme Court has explained, "[p]ersonal-capacity suits seek to
impose personal liability upon a government official for actions
he takes under color of state law," while official-capacity
suits "generally represent only another way of pleading an
action against an entity of which an officer is an agent."
*Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quotations
omitted). Different legal theories are available to a plaintiff,
and defenses available to a defendant, in suits brought against
officers in individual versus official capacities – such as
qualified immunity, available to the individual-capacity
defendants in *Tendo II* but not to the federal government under
the FTCA. *Andrews v. Daw*, 201 F.3d 521, 525 (4th Cir. 2000);
*Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994)
(stating that "qualified immunity will not immunize the United
States from liability" under the FTCA).

27

The *Tendo II* Court made this distinction clear when it explained that the officer-defendants' "individual actions" did not violate Tendo's constitutional rights. 2021 WL 9477088 at *1. It essentially explained that those defendants were the wrong ones for the harm that Tendo suffered, noting that Tendo's damages were (allegedly) caused "by virtue of [the defendants'] positions and duties." *Id.* (record citation omitted). The "functional approach" to privity for *res judicata* purposes requires the conclusion that the *Tendo II* dismissal does not preclude a suit against the United States Government. *Cho*, 991 F.3d at 169.

*d. State Law Elements*

Under the FTCA, the government may be held liable for damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Government asserts that Tendo's various state law tort claims fail to state a claim. The Court will address each in turn.

i.   Abuse of Process

Tendo has stated a claim for abuse of process under Texas law. To show abuse of process under Texas law,[10] a plaintiff must allege that "(1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process, (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage resulted to the plaintiff as a result of such illegal act." *Moore v. Bushman*, 559 S.W.3d 645, 653 (Tex. App. 2018).

The Government does not contest the substantive elements of Tendo's abuse of process claim. Instead, it asserts that Tendo does not attribute any specific conduct to the defendants named in this lawsuit. But the Complaint alleges that "officials at

---

[10] The Government asserts that Tendo may not assert claims related to the deportation proceedings in Louisiana or Arizona because of the FTCA's presentment requirement, discussed above. For the reasons also outlined above, the Court concludes that Tendo is not barred from bringing those claims. It also notes that the required elements for an abuse of process claim under Louisiana and Arizona law are substantially similar to those under Texas law. *See Waguespack, Seago & Carmichael (A PLC) v. Lincoln*, 768 So. 2d 287, 290-91 (La. App. 1 Cir. 2000), (requiring "(1) the existence of an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular prosecution of the proceeding."); *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020, 1060 (D. Ariz. 2012) (requiring "(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of proceedings."). Aside from its presentment argument and the "no-conduct" argument addressed above, the Government has not disputed that Tendo has stated a claim under Arizona and Louisiana law.

DHS and ICE" knew about the plans to deport Tendo before they began. ECF No. 1 at 15. It further alleges that ICE used the deportation process to "send[] a message to everyone about what would happen if they resisted in any way," *id.* at 14, specifically intended to abuse Tendo "so that he would abandon his lawful applications for asylum," and sought to "deter future migrants from seeking refuge in the United States." *Id.* at 29. The Complaint also states that FOIA responses and parallel litigation have revealed that federal officials "treat mass deportations to African countries as a sport." *Id.* at 4. Even more troubling is the allegation that ICE officials use restraint, incarceration, and deportation procedures as pretext for racial discrimination. *Id.* at 3 (stating that Black asylum seekers experience higher rates of detention and solitary confinement, and referencing repeated improper use of the WRAP); 17 (noting other complaints regarding improper use of force against African asylum seekers). This plausibly attributes conduct to the United States Government.

Because the Government has not contested the other elements of Tendo's abuse of process action, Tendo has plausibly alleged that the Government (1) made an improper and unwarranted use of force in the deportation proceedings; (2) had an ulterior motive (specifically, to signal negative consequences stemming from

resistance to ICE deportation proceedings); and (3) damage resulted. *Moore*, 559 S.W.3d at 653.

i.   Negligent supervision

A plaintiff seeking to state a claim for negligent supervision under Texas law must show "duty, a breach of that duty, and damages proximately caused by the breach." *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App. 2008). "To establish a claim for negligent supervision, a plaintiff must show that an employer's failure to supervise its employees caused his injuries." *Id.* Tendo has plausibly alleged negligent supervision.

The Government's argument boils down to a claim that Tendo has failed to allege that "any specific supervisory conduct proximately caused his injuries." ECF No. 24 at 23. As a threshold matter, employers have an obligation under Texas law to "adequately hire, train, and supervise employees." *Wilson v. Korth Direct Mortg., Inc.*, No. 3:23-CV-2158-D, 2023 WL 8569084, at *3 (N.D. Tex. Dec. 11, 2023); *Patino v. Complete Tire, Inc.*, 158 S.W.3d 655, 660 (Tex. App. 2005) ("The negligent performance of those duties may impose liability on an employer if the complainant's injuries result from the employer's failure to take reasonable precautions to protect the complainant from the misconduct of its employees."). If the Government's argument is that it had no obligation to train and supervise its employees,

the Court disagrees. And more narrowly, Tendo has plausibly
stated that ICE either knew or should have known that its
officials were violating specific agency policies or committing
certain abuses, and that those violations were likely to harm
detainees such as Tendo.

First, Tendo claims that the Government negligently failed
to supervise its employees with regard to their use of force,
specifically when using the WRAP. ECF No. 1 at 30. He notes that
ICE's 2011 detention standards (the "Detention Standards")
govern conduct at PIDC and in Alexandria. *Id.* at 23. Those
Standards require officers to induce cooperation prior to using
force, and authorize only the "degree of force necessary to gain
control of the detainee." *Id.* They also prevent use of
restraints as a form of punishment, and require an assessment of
the detainee's medical status prior to using force. *Id.* at 24.
Tendo also alleges that ICE received reports of improper use of
restraints during deportation in the past, *see id.* at 27-28, and
nonetheless failed to take corrective action. Accepting these
allegations as true, Tendo has plausibly alleged that the
Government's failure to adequately supervise its agents caused
Tendo harm.

Second, Tendo has plausibly alleged that the Government
knew of his medical needs, *id.* at 7-8, knew that its officers
had reportedly engaged in negligent medical care in the past,

*id.* at 26, and nonetheless failed to ensure that its PIDC officers would provide Tendo with adequate medical care. If Tendo can prove that this allegedly negligent medical care was "proximately caused by negligent supervision or training, the Government would be liable under a negligent training or supervision theory." *Holcombe v. United States*, 388 F. Supp. 3d 777, 806 (W.D. Tex. 2019).

Finally, Tendo asserts that the government is liable for negligent supervision relating to officers' "failure to provide basic necessities to Plaintiff during transport by land and air, including water, food, and access to the restroom." ECF No. 1 at 10. Here, too, Tendo has plausibly alleged that ICE was previously sued for comparable failure to provide necessities during transport. ECF No. 1 at 27 (noting that several Somali individuals sued ICE after "being in five-point shackles for over forty hours, being forced to urinate in bottles or on themselves, and being threatened and beaten by ICE officers"); 28 (referencing another complaint claiming that "an officer choked a detainee after the detainee requested food"). This could, plausibly, have created a duty for ICE to improve its supervision and training practices – and ICE's failure to do so also could, plausibly, have caused Tendo's injuries during transportation. ICE's training and supervision practices – and whether those practices were negligent – are open factual

questions, but Tendo's allegations are sufficient to survive a 12(b)(6) motion.[11]

For the reasons outlined above, Tendo's claims for negligent supervision related to events in Louisiana and Arizona also survive the Government's motion to dismiss. *See Louisiana Fair Hous. Action Ctr. Inc. v. Plantation Mgmt. Co. LLC*, No. CV 20-2339, 2022 WL 1540575, at *7 (E.D. La. May 16, 2022) (recognizing a Louisiana negligent supervision tort); *Leibel v. City of Buckeye*, 364 F. Supp. 3d 1027, 1045 (D. Ariz. 2019) (same under Arizona law).

ii.  Intentional infliction of emotional distress

Tendo also alleges that the Government is liable for intentional infliction of emotional distress (IIED) under the FTCA. An IIED claim under Texas law requires proof that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting

---

[11] The Government has not meaningfully contested the other elements of the negligent supervision tort such as causation and damages. It states that "Tendo does not plausibly allege any specific supervisory conduct, let alone negligent supervisory conduct," but this argument misses the mark because the point of Tendo's claim is that ICE knew that its officers were committing these abuses – and had written policies in place to ostensibly prevent such abuses – but failed to implement supervision and training practices to prevent those violations. It is not Tendo's obligation to thoroughly describe all of ICE's training practices.

emotional distress was severe." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). IIED is a "gap-filler" tort, "judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Id.* at 447.

The Government makes two arguments. First, it submits that Tendo does not identify any specific conduct that was "intentional or reckless, let alone conduct that was also extreme and outrageous." ECF No. 24 at 26. The Court disagrees. Tendo has alleged that ICE detained him, provided him with medical care, and ultimately attempted to deport him. All three are intentional acts. Tendo also claims that ICE agents intentionally placed him in the WRAP and declined to release him despite his requests to use the restroom. ECF No. 1 at 13. For purposes of the motion to dismiss, the Court concludes that a finder of fact could plausibly find hours of detention in the WRAP, forcing Tendo to "remain[] in feces and urine all the way from Port Isabel to Alexandria," and deprivation of food, water, and medication to be "extreme and outrageous conduct." *Id.* Failure to provide Tendo with adequate medical care despite worsening cataracts and open boils, ECF No 1 at 8, also satisfies that threshold.

35

Second, the Government argues that because Tendo's IIED claim relies on "the conduct that supports his medical negligence and WRAP-related claims" he may not claim IIED because of the Texas Supreme Court's gap-filling language. ECF No. 24 at 27. Texas courts have explained that IIED is unavailable even when other remedies do not explicitly preempt the tort, because "their availability leaves no gap to fill." *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005). The "gravamen" of Tendo's IIED claim is the Government's unreasonable use of restraints, "verbal and physical abuse," and ostensibly vindictive deportation proceedings. ECF No. 1 at 34. These facts also plausibly support other tort actions including assault, battery, abuse of process, and simple negligence, showing that there is no "'gap' to fill" by reliance on IIED. *Mejia v. Ayala*, No. 3:21-CV-0587-D, 2021 WL 6063583, at *4 (N.D. Tex. Dec. 22, 2021). Accordingly, the Court must dismiss Tendo's IIED claim under Texas law. However, the Government has not submitted briefing on Louisiana or Arizona IIED law. Those claims may proceed.

## C. The APA

The final merits dispute concerns whether Tendo has stated a claim for violation of the Administrative Procedure Act, 5 U.S.C. § 702. Specifically, Tendo argues that DHS and ICE have violated the *Accardi* principle, which generally requires

administrative agencies to follow their own rules. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own regulations."). He submits that the agencies "failed to comply with" their own policies "regarding removals, use of force, and health care" because they used unreasonable and unnecessary force, and improperly employed restraining devices. ECF No. 1 at 34-35.[12] Tendo also argues that agency regulations entitle detained individuals to extensive healthcare services, and oblige agencies to "respond to medical complaints and take detained individuals' medical needs into account before transferring them to other facilities." *Id.* at 35.

---

[12]  The Government argues that *Accardi* applies only to procedural due process claims.  ECF No. 35 at 15.  It has been noted, however, that in *Arizona Grocery Co. v. Atchinson, T. & S.F. Ry. Co.*, 284 U.S. 370 (1932), "the Supreme Court applied the *Accardi* principle (before it was called the *Accardi* principle) to a substantive regulation."  *Jane v. Rodriguez*, No. CV 20-5922 (ES), 2020 WL 6867169, at *14 (D.N.J. Nov. 23, 2020) (citing *Arizona Grocery Co.*, 284 U.S. at 386, 389).  "[T]he Supreme Court has never overturned *Arizona Grocery*." *Id.*; *cf. Jefferson v. Harris*, 285 F. Supp. 3d 173, 185 (D.D.C. 2018) (collecting cases and noting that "the caselaw is far from clear as to whether an *Accardi* claim is properly raised as a substantive due process allegation .... [or] as arising under the APA or as [a] stand-alone cause[ ] of action").

*a. Final agency action*

Because actions alleging violation of the *Accardi* principle
are based upon the APA, they must challenge a "final agency
action." 5 U.S.C. § 704; *see also Damus v. Nielsen*, 313 F. Supp.
3d 317, 337 (D.D.C. 2018) (collecting cases for the principle
that *Accardi* claims are actionable under the APA). "Whether an
agency's action is 'final' depends on (1) whether it
'consummates the agency's decisionmaking process' and (2)
whether it is 'one by which rights or obligations have been
determined, or from which legal consequences flow.'" *Americans
for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. CV 22-
3118 (CKK), 2023 WL 1438376, at *18 (D.D.C. Feb. 1, 2023)
(quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

Final agency action generally requires "discreteness."
*Velesaca v. Decker*, 458 F. Supp. 3d 224, 238 (S.D.N.Y. 2020)
(citing *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63
(2004)). Courts have found that "an on-going program or policy
is not, in itself, a 'final agency action' under the APA."
*Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001). This
reflects the principle that the APA facilitates review of
"concerted decision[s]," not "negligent failure to enforce a
policy." *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*
("*SPLC*"), No. CV 18-0760 (CKK), 2023 WL 2564119, at *6 (D.D.C.
Mar. 15, 2023). In essence, the APA does not support

"generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006).

For purposes of the motion to dismiss, Tendo has plausibly alleged a final agency action. *See Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) (finding that plaintiff had alleged sufficient facts to support the inference of an official policy for purposes of the *Accardi* principle). Essentially, Tendo claims that ICE and DHS had high-level policies of noncompliance with their stated use-of-force and medical practice guidelines. The Court will address each in turn.

First, Tendo has alleged that ICE and DHS made a concerted decision not to adhere to its use-of-force guidelines – and specifically its policies regarding the use of restraint. While "every administrative oversight by an administrative agency [does not give] rise to a [] claim under *Accardi*," *Benavides v. Gartland*, No. 5:20-CV-46, 2020 WL 3839938, at *11 (S.D. Ga. July 8, 2020), Tendo's allegations substantially mirror plaintiffs' allegations in comparable cases that have found *Accardi* violations. For instance, in *Torres v. United States Dep't of Homeland Sec.*, the District Court for the Central District of California concluded that ICE violated the *Accardi* principle when it did not adequately enforce its promulgated detention standards regarding detainee access to legal counsel. 411 F. Supp. 3d 1036, 1069 (C.D. Cal. 2019). The court relied on three

specific factual allegations in concluding that these alleged violations constituted a final agency action: first, it noted that an "unannounced [DHS Office of the Inspector General] visit" to the detention center identified several violations of ICE's detention standards and resulted in several recommendations for improved compliance. *Id.* Second, ICE later represented that it would conduct its own internal review of its compliance. And finally, the Inspector General also reviewed previous ICE inspections in making its recommendation. The court concluded that "ICE regularly initiates and concludes [detention standards]-compliance reviews," making any non-compliance "the result of an agency decision not to enforce the terms." *Id.*

Similarly, here, Tendo has alleged that ICE was on notice of its alleged non-compliance with its use of force standards. The Complaint alleges that on August 26, 2020, four human rights groups filed a complaint with the Office of Civil Rights and Civil Liberties and the DHS Office of Inspector General, calling for the agency to investigate "violence and discriminatory practices against African asylum seekers, including the use of force." ECF No. 1 at 17. On October 13, 2020, two Congressional Representatives sent ICE a letter detailing ICE's improper use of "pepper spray, physical restraints, and other use of force measures to obtain the signature or fingerprints of detained asylum seekers on travel documents in violation of ICE's

detention standards." *Id.* at 18. ICE also has a documented
history of using full-body restraints during deportation
proceedings, which has led to lawsuits in the past. *Id.* at 27.
In response to a FOIA request, the University of Washington's
Center for Human Rights received a 58-page document with "99
different complaints" regarding mistreatment "during or in
connection with ICE Air and removal flights." *Id.* at 28.

   While none of these allegations conclusively indicate that
ICE or DHS made an official decision to liberally use
substantial force (including full-body restraining devices)
during detainee transport, they collectively allow for the
inference that the agencies were aware of and decided to allow
the practice. *Amadei*, 348 F. Supp. 3d at 165 ("[N]umerous courts
have found that a plaintiff can satisfy the finality requirement
without offering evidence of a formal or official statement
regarding the agency's position."). Additionally, the fact that
ICE and DHS have use of force guidelines (while not dispositive)
allows for the inference that the agencies intended those
guidelines to govern how agency employees conducted detention-
related activities. *Id.* at 166 (noting that an agency's
representation that it was "following a policy" counseled in
favor of finding final agency action). Insofar as the agencies
have considered the issue and decided to continue to use force –
including full-body restraining devices such as the WRAP – that

decision plausibly "marks the consummation of the agency's decisionmaking." *Bennett*, 520 U.S. at 156. And "the rights of detainees and obligations of detention contract facilities [] flow from any agency action regarding detention standards compliance and enforcement." *Torres*, 411 F. Supp. 3d at 1069.

The Government relies on *SPLC* for its argument that Tendo has not alleged a reviewable final agency action. *See* 2023 WL 2564119, at *4-*6. That case involved ICE policies that allegedly impeded SPLC lawyers and affiliated counsel from speaking with detainees. *Id.* at *2. The court concluded that ICE's actions were not "final" under the APA because there was no allegation that the government "made any concerted, final decision to affirmatively cause the challenged conditions of confinement." *Id.* at *5. It explained that plaintiffs may not challenge detention facilities' COVID policies or "telephonic access policies" when those "failures are not predicated upon a single, concerted decision to forgo enforcement." *Id.* Here, though, Tendo has alleged sufficient facts to allow for the plausible inference that ICE made a "concerted decision" to use force and full-body restraining devices during detainee transport procedures (ostensibly in violation of its stated use-of-force guidelines). He has alleged that ICE continues to use these policies despite repeated public notice of these practices

and their alleged illegality. This is sufficient, at the motion to dismiss stage, to state a claim of final agency action.

The same is true for Tendo's claims regarding ICE's medical practices at PIDC. While Tendo may ultimately struggle to prove that ICE or DHS made a "concerted decision" to provide him with inadequate diabetes treatment,[13] he has plausibly alleged that the agencies deliberately created conditions of confinement that increased his risk of COVID. *See* ECF No. 1 at 9 ("Detained individuals were not provided with soap or hand sanitizer, had to share toilets with dozens of people, and were unable to isolate in overcrowded dormitories."). This includes ICE's apparent lack of a policy to separate individuals at heightened risk from COVID from the general population and screen individuals upon arrival. *Id.* at 15-16; *see also Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 2086482, at *6 (S.D. Fla. Apr. 30, 2020) ("[P]ursuant to the CDC's guidelines, ICE is required to restrict transfers, quarantine new detained individuals, allow appropriate social distancing, perform pre-intake screening, supply detainees with sufficient hygiene and cleaning

---

[13] Indeed, the Complaint does not allege that ICE or DHS made a considered decision regarding (or even were aware of) Tendo's diabetes treatment at PIDC. Therefore, to the extent that Tendo claims an *Accardi* violation based upon his inadequate blood sugar monitoring, medication, and diet, that allegation is dismissed for failure to state a claim.

supplies.").[14] This practice at PIDC also plausibly constitutes a "consummation of the agency's decisionmaking process" from which "legal consequences" – such as a detainee's proximity to other at-risk detainees – "will flow." *Bennett*, 520 U.S. at 156.[15]

b. *Adequate remedy bar*

The Government next argues that the APA's "adequate remedy" bar forecloses Tendo's *Accardi* claim. ECF No. 24 at 30 (citing 5 U.S.C. § 704). The APA provides that a court may review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Supreme Court has "long instructed that the 'generous review provisions' of the APA must be given 'a hospitable interpretation' such that 'only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.'" *El Rio*

---

[14] Tendo's allegations go beyond the claims in other cases that have declined to find actionable culpability for *Accardi* purposes. *See, e.g.*, *Benavides*, 2020 WL 3839938, at *11 ("The evidence arguably suggests technical, inadvertent violations of CDC Guidance, such as mistakes on screening forms. However, . . . this Court simply cannot find that every administrative oversight by an administrative agency gives rise to a constitutional claim under *Accardi*."); *Americans for Immigrant Just.*, 2023 WL 1438376, at *18 (declining to review "thousands of individual failures to comply with a particular agency [COVID] policy in which each individual failure does not itself fix particular legal consequences"). Tendo has alleged more than administrative oversight; he has alleged considered intake and housing practices that substantially increased his risk from COVID.

[15] Given that Tendo does not allege that he contracted COVID, the Court is uncertain what his damages are from this alleged *Accardi* violation.

*Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)).

The Supreme Court addressed a comparable question in *Bowen v. Massachusetts*, 487 U.S. 879 (1988). That case evaluated whether the Tucker Act, 28 U.S.C. §§ 1346(a), 1491, precluded judicial review under the APA pursuant to the adequate remedy bar. The Supreme Court explained that "the primary thrust of [the adequate remedy bar] was to codify the [administrative] exhaustion requirement," and to avoid jurisdictional confusion with other statutes that defined

> specific procedures to be followed in reviewing a particular agency's action; for example, Federal Trade Commission and National Labor Relations Board orders were directly reviewable in the regional courts of appeals, and Interstate Commerce Commission orders were subject to review in specially constituted three-judge district courts. When Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies.

*Id.* at 903. It went on to note that while money damages litigation "in the Claims Court can offer precisely the kind of 'special and adequate review procedures' that are needed to remedy particular categories of past injuries,'" *id.* at 904 n.39, it is not the type of procedure that will "oust a district court of its normal jurisdiction under the APA." *Id.* at 904. The APA "is tailored" to "manag[e] the relationships between States

45

and the Federal Government that occur over time and that involve constantly shifting balance sheets." *Id.* One factor in this conclusion was that "a naked money judgment against the United States [may not] always be an adequate substitute for prospective relief." *Id.* at 905. Because the APA allowed for prospective relief while the Tucker Act did not, the Tucker Act did not present an "adequate remedy" for purposes of the bar. *Id.*

The Court concludes that the FTCA is not an "adequate remedy" within the meaning of 5 U.S.C. § 704 so as to preclude an action under the APA. Two considerations are central to this decision: first, that like the Tucker Act, the FTCA provides review procedures that are needed to remedy "particular categories of past injuries" – namely, torts committed by federal employees. *Bowen*, 487 U.S. at 904 n.39. The APA, on the other hand, "manages the relationships" between federal agencies and the individuals impacted by the decisions made by those agencies. This segues to the second point: while the FTCA allows for suits for money damages, 28 U.S.C. § 1346(b)(1), it does not waive sovereign immunity for equitable relief. *Robinson v. Sherrod*, 631 F.3d 839, 841 (7th Cir. 2011) (citing *Hatahley v. United States*, 351 U.S. 173, 182 (1956) ("[T]he District Court did not possess the power to enjoin the United States.")); *Pesnell v. United States*, 64 F. App'x 73, 74 (9th Cir. 2003)

46

("The FTCA does not contain a waiver of sovereign immunity for equitable claims."). This means that for a plaintiff (like Tendo) seeking equitable relief, the FTCA is clearly not an adequate remedy. *Bowen*, 487 U.S. at 905 ("[A] naked money judgment against the United States will [not] always be an adequate substitute for prospective relief."); *Robinson*, 631 F.3d at 841 ("[D]amages might be an inadequate remedy for debilitating, constant, and perhaps increasing pain. . . . [F]ederal inmates can invoke the APA to obtain an order for medical treatment."). Tendo's claim is not barred.

## II.  Defendants' Motion to Change Venue

The Government alternatively requests transfer of this case to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides that a district court may transfer "any civil action to any other district where it might have been brought" for the "convenience of parties and witnesses, in the interest of justice." The purpose of the transfer statute is "to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

As the Government notes, the FTCA provides that an action against the United States "may be prosecuted only . . . in the judicial district where the plaintiff resides, or wherein the

act or omission complained of occurred." 28 U.S.C. § 1402(b).

Therefore, the Court concludes that venue would be proper in

either district. Accordingly, the sole question question is

"whether transfer is appropriate." *Burgos v. United States*, No.

16-CV-7091 (RA), 2017 WL 2799172, at *2 (S.D.N.Y. June 27,

2017). In determining whether transfer is appropriate, "the

court should consider:"

> (1) the plaintiff's choice of forum, (2) the convenience of
> witnesses, (3) the location of relevant documents and
> relative ease of access to sources of proof, (4) the
> convenience of parties, (5) the locus of operative facts,
> (6) the availability of process to compel the attendance of
> unwilling witnesses, and (7) the relative means of the
> parties.

*Corley v. United States*, 11 F.4th 79, 89 (2d Cir. 2021) (quoting

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir.

2006)). The Government has "the burden of establishing that this

action should be transferred," and "[a]bsent a clear and

convincing showing that the balance of convenience strongly

favors an alternate forum, discretionary transfers are not

favored." *Gaffney v. Shelton*, No. 2:11-CV-00189, 2012 WL

1439799, at *2 (D. Vt. Apr. 26, 2012) (quoting *Tom and Sally's

Handmade Chocolates, Inc. v. Gasworks, Inc.*, 977 F. Supp. 297,

302 (D. Vt. 1997)).

**A. Plaintiff's Choice of Forum**

The Court find that – especially in this FTCA action – the

plaintiff's choice of forum militates heavily in favor of

keeping the action in the District of Vermont. *See D.H. Blair &
Co. v. Gottdiener*, 462 F.3d 95, 107 (2d Cir. 2006) (stating that
a plaintiff's choice of forum deserves "great weight"); *see also
Coady v. Ashcraft & Gerel,* 223 F.3d 1, 11 (1st Cir. 2000)
("[T]here is a strong presumption in favor of the plaintiff's
choice of forum.").

   This particular cause of action is relevant to the transfer
determination. As the District Court for the District of
Massachusetts explained, the FTCA authorizes venue in either a
plaintiff's home district or the district "where the act or
omission occurred," 28 U.S.C. § 1402(b), which reflects a
"policy choice Congress made not to force individuals to travel
outside their home district to bring FTCA suits." *K.O. by &
through E.O. v. United States*, 651 F. Supp. 3d 331, 340 (D.
Mass. 2023). If Congress intended to allow FTCA suits only in
locations where torts were allegedly committed, the statute's
venue provision would say so; indeed, the statute's construction
reflects the logical principle that the United States government
has agents in every state, and can litigate accordingly. *See
Coyoy v. United States*, 526 F. Supp. 3d 30, 46 (D.N.J. 2021)
("The United States has the resources to easily litigate this
case anywhere in the country. Indeed, that reality is reflected
in the specialized venue statute for actions against the United
States, which permits suit to be brought plaintiff resides.")

(internal punctuation omitted). Because Tendo has legitimately availed himself of a narrow congressional venue authorization, his choice is entitled to greater deference. *Alfaro v. United States*, No. CV 21-09668-PA (RAO), 2023 WL 2908583, at *3 (C.D. Cal. Feb. 16, 2023), report and recommendation adopted, No. CV 21-09668 PA (RAO), 2023 WL 3979486 (C.D. Cal. Apr. 12, 2023) ("[A] plaintiff's choice of venue pursuant to a special venue statute may be entitled to even greater deference.").

**B. Convenience of Witnesses**

"The convenience of both party and nonparty witnesses is probably considered the single most important factor in the analysis of whether a transfer should be granted." *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 197 (S.D.N.Y. 2000). This factor is mostly neutral. The government states that it has identified "five party-controlled witnesses and 15 non-party witnesses to the key events of September 1, 2020." ECF No. 24 at 34. These are ICE employees, and courts typically "discount any inconvenience to the parties' employees, whom the parties can compel to testify." *Getz v. Boeing Co.*, 547 F. Supp. 2d 1080, 1084 (N.D. Cal. 2008); *see also K.O.*, 651 F. Supp. 3d at 341 ("[D]efendant cannot claim that they are inconvenienced" when out-of-state witnesses are employees).

The government also references 15 non-party witnesses, ICE contractors. ECF No. 24 at 35. Thirteen of the 15 reside in

Texas. The Government has not stated whether "non-party witnesses will refuse to comply voluntarily with requests for testimony or requests for the production of evidence." ECF No. 24 at 37 n.11. On the other side of the ledger, Tendo represents that he intends to testify, as do several additional Vermont-based witnesses including Tendo's doctors, religious leaders, and employers. ECF No. 30 at 25. Regardless of venue, one party will be inconvenienced by witness location, but the possibility of video depositions mitigates the harm from this inconvenience. *See Flores v. United States*, 142 F. Supp. 3d 279, 289 (E.D.N.Y. 2015) (noting that witness attendance is less relevant when videotaping is possible). It is the "possibility of having [witness testimony] at the trial that is important," not simply the convenience of the witnesses. *Dale v. United States*, 846 F. Supp. 2d 1256, 1257 (M.D. Fla. 2012). Accordingly, witness convenience does not weigh strongly towards one venue or another.

### C. Location of Documents and Sources of Proof

This factor is neutral. As the Government notes, modern technology – including "faxing, scanning, and emailing documents," ECF No. 24 at 36 – makes the burden associated with transporting and sharing documents minimal. *See also Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998) ("[T]he location of evidence and witnesses . . . is no longer

weighed heavily given the modern advances in communication and transportation."). Insofar as this factor relates to the availability of witnesses, that issue is addressed above.

### D. Convenience of Parties

Convenience to the parties weighs in favor of Tendo. Tendo's briefing outlines his precarious medical situation for which he takes multiple medications. His diabetes makes him prone to stress and exhaustion, and has caused serious vision problems, dental issues, and a weakened immune system. ECF No. 30 at 22. He is currently working as chaplain at the University of Vermont Medical Center and as a Clinical Patient Safety Attendant, and states that "[t]raveling to Texas would require him to take unpaid leave, which he cannot afford and may jeopardize his employment." *Id.* at 22-23. The Government, on the other hand, "has the resources to easily litigate this case anywhere in the country" and an "appointed or acting United States Attorney in every district, including this one." *Coyoy*, 526 F. Supp. 3d at 45.

Another factor relevant to the "convenience of the parties" analysis is pre-trial work. Again, to the extent that videotaped depositions are possible, that mitigates any prejudice to either side. Additionally, because Tendo has counsel in Texas, Texas-based witnesses may likely be deposed in their home districts. And if there is concern with "costs associated with providing

transportation and lodging for the government's witnesses at trial, clearly the government is in a better position to bear such costs than a person in [Tendo's] position." *Fuanya v. United States*, No. 21-CV-02191-REB-NYW, 2022 WL 1027149, at *6 (D. Colo. Apr. 6, 2022).

As other courts have noted:

> The dispute over these factors reduces to this: (a) whether the United States Government, present in every district and possessing nearly unlimited resources, should litigate a suit in New Jersey; or (b) whether [the Court] should require a destitute, grieving refugee from an impoverished nation to repeatedly make an 1,800 mile trip from [Vermont] to Texas to litigate [his] case.

*Fuanya*, 2022 WL 1027149, at *7 (quoting *Coyoy*, 526 F.Supp.3d at 44-45). Like those courts, this one chooses the latter option.

**E. Locus of Operative Facts**

This factor marginally favors the Government. Most of the allegations underlying Tendo's complaint took place in Texas. However, some occurred in Louisiana and Arizona. And Tendo's lasting injuries and treatment have taken place in Vermont. *See Eduardo I.T. v. United States*, No. 22-CV-05333-DMR, 2023 WL 10354060, at *4 (N.D. Cal. Feb. 24, 2023) (declining to transfer FTCA case in part because "[t]he complaint contains detailed allegations of Plaintiffs' ongoing emotional trauma in this district."). Additionally, as the District Court for the District of New Jersey noted, this factor holds less weight in FTCA cases because "28 U.S.C. § 1402 gives plaintiffs the right

to sue in their home state even when the events in question occurred in another state, so it is clear that this state of affairs was contemplated by Congress when it" waived sovereign immunity for tort claims brought in plaintiffs' places of residence. *Coyoy*, 526 F. Supp. 3d at 46 n.17.

The Court also notes that while much of the operative law in this case will be from other jurisdictions, that also does not weigh heavily in favor of transferring the action. This Court, like any federal court sitting in diversity, commonly applies non-forum law. *See, e.g.*, *Ha v. Conn*, No. 2:20-CV-155, 2024 WL 2932900, at *1 (D. Vt. June 11, 2024) (applying Virginia law). "The court can ascertain Texas law with help from counsel." *Flores*, 142 F. Supp. 3d at 290.

**F. Process to Compel Attendance of Unwilling Witnesses**

This factor is, again, mostly neutral. As explained above, both parties have witnesses in non-preferred fora that would be beyond the subpoena power of the relevant court. And neither party has represented that any of its witnesses would be unwilling (or unable) to testify or sit for depositions, especially when those testimonial obligations could be conducted remotely.

**G. Means of the Parties**

The United States Government has substantially greater means to litigate this case in an inconvenient venue than Tendo.

As noted above, Tendo represents that he cannot take paid or unpaid leave from work and has spent most of his savings on his medical expenses. ECF No. 30 at 22. The Government has a dedicated litigating office in every district of the country and faces substantially fewer financial barriers.

The Government has not satisfied its "burden of establishing that this action should be transferred" with a "clear and convincing showing." *Gaffney*, 2012 WL 1439799, at *2. Accordingly, its motion is denied.

## CONCLUSION

For the foregoing reasons, the Government's motion to dismiss Tendo's complaint (ECF No. 24) is **granted** in part and **denied** in part. Its motion for change of venue (ECF No. 24) is **denied**.

DATED at Burlington, in the District of Vermont, this 5th day of August, 2024.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge